**CENTURY INDEMNITY COMPANY,**
**Appellant**

v.

**CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, SUBSCRIBING TO RETROCESSIONAL AGREEMENT NOS.** 950548, 950549, and 950646.

**No. 08–2924.**

United States Court of Appeals, Third Circuit.

Argued June 2, 2009.

Filed: Oct. 15, 2009.

---

Carter G. Phillips (argued), William M. Sneed, Melanie Jo Triebel, Sidley Austin LLP, Chicago, IL, Lawrence Nathanson, Siegal & Park, Mount Laurel, NJ, for Appellant.

Mark J. Hill, Mark J. Hill & Associates, Philadelphia, PA, John M. Wulfers, Hugh S. Balsam, Susan P. Jordan (argued), Locke Lord Bissell & Liddell LLP, Chicago, IL, for Appellee.

Before McKEE, HARDIMAN and GREENBERG, Circuit Judges.

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION ............................................................. 518

II. BACKGROUND ............................................................. 519
 A. Insurance, Reinsurance, and Retrocession .............................. 519
 B. The Dispute ......................................................... 519

III. JURISDICTION AND STANDARD OF REVIEW ............................. 521

IV. DISCUSSION ............................................................. 522
 A. Whether the District Court Properly Compelled Arbitration Based on
 the Retrocessional Agreements' Incorporation of the Reinsurance
 Treaties ............................................................ 522
 1. The Federal Arbitration Act ..................................... 522
 2. Compelling Arbitration ......................................... 523

518

 3. Whether the Retrocessional Agreements' Incorporation-by-Reference Language Effected a Valid Agreement to Arbitrate Between Century and Lloyd's ....................................524

 a. Two Threshold Issues Regarding the Standards That Apply When Determining Whether There Is a Valid Agreement to Arbitrate ............................................525

 (1) Whether the Presumption in Favor of Arbitration Applies to the Initial Question Whether the Parties Agreed to Arbitrate ............................................525

 (2) The "Express" and "Unequivocal" Standard ...................527

 b. Whether Century and Lloyd's Agreed to Arbitrate Disputes Arising from the Retrocessional Agreements ...................532

 (1) Choice of Law: Pennsylvania law applies .....................532

 (2) Principles of Pennsylvania Contract Law......................533

 (3) Binding Nonsignatories Through Incorporation by Reference ............................................533

 c. Construing the Retrocessional Agreements Under Pennsylvania Law .......................................534

 d. Three Surety Cases in Which General Incorporation Provisions Effectively Incorporate Arbitration Agreements.....535

 e. Declining to Incorporate Restrictively Worded Arbitration Clauses That Refer to the Immediate Parties ..................538

 f. Questions of Existence and of Scope ..........................544

 g. John F. Harkins Co............................................547

 h. Incorporation by Reference for a Limited Purpose ..............548

 i. The Retrocessional Agreements ................................549

 (1) The Agreement's Language and Structure ......................549

 (2) Construing the Agreement ......................................550

 (3) Language Lacking from the Incorporation Clauses ..............552

 (4) Century's Problems ...........................................553

 (5) The Forum–Selection and Service-of-Suit Clause ...............554

 (6) Imprecision in Incorporation by Reference ....................554

 4. Whether This Particular Dispute Falls Within the Scope of Century and Lloyd's Valid Agreement to Arbitrate .................555

 5. Whether The District Court Properly Compelled Arbitration ..........556

 B. Whether the Arbitration Award Should Be Vacated Because the Arbitrators Excluded Certain Evidence from Consideration.............556

V. CONCLUSION .....................................................559

## I. INTRODUCTION

This matter comes on before this Court on an appeal by appellant Century Indemnity Company ("Century") from two orders of the District Court, one entered May 18, 2006, granting a motion of appellee Certain Underwriters at Lloyd's, London ("Lloyd's") to compel arbitration of a disputed claim based on a set of reinsurance-of-reinsurance agreements, and one entered May 30, 2008, denying Century's motion to vacate an arbitration panel's subsequent award in favor of Lloyd's. Inasmuch as we conclude both that there was a valid agreement to arbitrate between Century and Lloyd's and that the dispute in this case falls within the scope of that agreement, we hold that the District Court properly compelled the parties to submit their dispute to arbitration. Moreover, because we reject Century's argument that the arbitration panel deprived it of a fair hearing when the panel excluded certain evidence that Century proposed to introduce, we also hold that the District Court properly denied Century's motion to vacate the arbitration panel's award.

## II. BACKGROUND

### A. Insurance, Reinsurance, and Retrocession

Insurance, the shifting of risk through contract, may involve multiple layers of shifts. To start the process, insurance companies issue policies under which the insurer assumes certain risks in exchange for premiums that the policyholders pay. The insurance companies then may pass on all or part of the risk through reinsurance agreements, in which another insurance company provides insurance of all or part of the first insurer's risk by accepting such risk in exchange for a percentage of the original premium.[1] Reinsurance agreements covering classes or lines of business, rather than a particular policy, are called reinsurance treaties. Subsequently, reinsurers may seek to spread their exposure to risk through further reinsurance. The reinsurance of reinsurance is called a retrocession, and the reinsurers of reinsurers—that is, reinsurers who assume retrocession risk through retrocessional agreements—are called retrocessionaires.[2]

This case involves a dispute between Century, the original reinsurer, and Lloyd's, the retrocessionaire, arising from three retrocessional agreements under which Lloyd's agreed to reinsure certain reinsurance treaties that Century's predecessor had formed with Argonaut Insurance Company ("Argonaut"), another insurer that was the original insurer of the insured in the policies underlying the litigation.

### B. The Dispute

The material facts are not in dispute. Century's predecessor, the Insurance Company of North America ("INA"), reinsured Argonaut according to the terms of three excess-of-loss treaties (the "reinsurance treaties"). Argonaut had issued insurance policies to its insureds, Western Asbestos Company and Western MacArthur Company (together "Western"), to cover losses from Western's distribution of asbestos products. INA, Century's predecessor, then entered into three retrocessional agreements with Lloyd's (the "retrocessional agreements"), pursuant to which Lloyd's agreed to pay 90% of the losses in return for 90% of the premiums that accrued to Century's predecessor under the corresponding reinsurance treaties.[3]

In the late 1970s, Western began receiving injury claims from persons allegedly exposed to asbestos who sought to hold Western responsible for injuries traceable to their exposure. Western looked to Argonaut for coverage on the insurance policies that Argonaut had issued and that Western believed protected it against those claims, but Argonaut resisted Western's efforts, a position that led to declaratory judgment litigation between Western and Argonaut over the scope of the policies' coverage.

Argonaut then sought reimbursement for its litigation expenses from Century under its reinsurance treaties with Century. Century concluded that the reinsur-

---

1. *See* Black's Law Dictionary, Garner ed. at 1399 (9th ed., abr., 2009) (hereafter "Black's Law Dictionary"); *Travelers Cas. & Sur. Co. v. Gerling Global Reins. Corp.*, 419 F.3d 181, 183 n. 2, 184 n. 3 (2d Cir.2005) (discussing reinsurance).

2. *See* Black's Law Dictionary at 1432. The original reinsurer, reinsured by the retroces-

sionaire pursuant to the retrocessional agreement, is called the "retrocedent."

3. Inasmuch as the distinction between Century's predecessor, INA, and Century is immaterial here, we will refer to both as Century for the rest of this opinion.

ance treaties entitled Argonaut to recover those expenses and, accordingly, in 2001 made payments to Argonaut pursuant to the reinsurance treaties.

After paying Argonaut, Century turned to Lloyd's, its retrocessionaire, for Lloyd's's 90% share of Century's payout to Argonaut pursuant to the retrocessional agreements between Century and Lloyd's. Lloyd's refused to pay the approximately $2.2 million that Century sought, contending that it did not owe the reimbursement because Century should not have paid Argonaut for the declaratory judgment litigation expenses.

This lawsuit followed. Century sued Lloyd's in the Court of Common Pleas in Philadelphia County to recover the amount that Century alleged that Lloyd's owed it under the retrocessional agreements.[4] Lloyd's answered the complaint filed in state court, asserting that the retrocessional agreements incorporated the reinsurance treaties' arbitration clauses and that therefore the dispute should be arbitrated, and then Lloyd's removed the case to the District Court pursuant to 9 U.S.C. § 205.[5] In the District Court, Century moved to remand the case to the state court and Lloyd's moved to compel arbitration.

Of course, it was not immediately obvious that Lloyd's was entitled to arbitrate because the retrocessional agreements did not include arbitration provisions. Lloyd's nevertheless claimed that Century could be compelled to arbitrate their dispute because the retrocessional agreements incorporated by reference the arbitration clauses contained in the reinsurance treaties. The arbitration clauses in the reinsurance treaties state: "[i]f any dispute shall arise between the Company [Argonaut] and INA [Century] with reference to the interpretation of this Agreement or their rights with respect to any transaction involved, the dispute shall be referred to [arbitration]." App. at 59–60, 101, 127 (bracketed material added). The retrocessional agreements between Century and Lloyd's contain language referring to and incorporating "all" of the reinsurance treaties.

Lloyd's contended that the incorporation-by-reference provision in the retrocessional agreements incorporating "all" of the reinsurance treaties effectively incorporated their arbitration clauses, and thus the District Court could compel Century to arbitrate their dispute. On May 18, 2006,

---

4. Century initially filed suit against Lloyd's in federal court on May 31, 2005, but voluntarily withdrew the suit to refile it in state court. *Century Indem. Co. v. Certain Underwriters at Lloyd's*, No. 05–CV–6004, 2006 U.S. Dist. LEXIS 34177, at *3–4 (E.D.Pa. May 18, 2006). It is ironical that the case ultimately returned to the court system in which it originated.

5. Chapter 2 of the Federal Arbitration Act, 9 U.S.C. §§ 201–208, implements the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. Section 205 provides in relevant part:
 Where the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant or the defendants may, at any time before the

trial thereof, remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending.
As germane here, an arbitration agreement or arbitral award falls under the Convention if it arises out of a legal relationship that is (1) commercial and (2) between parties at least one of whom is not a United States citizen. 9 U.S.C. § 202; *see Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 448–49 (3d Cir.2003). Here, the retrocessional agreements' arbitration clauses fall within the Convention because the retrocessional agreements formed a commercial relationship between Century and Lloyd's and Lloyd's is not a U.S. citizen.

the District Court denied Century's motion to remand and granted Lloyd's's motion to compel arbitration, ruling that, as Lloyd's contended, the retrocessional agreements—though themselves lacking arbitration clauses—incorporated by reference the arbitration clauses contained in Century's reinsurance treaties with Argonaut. *Century Indem. Co. v. Certain Underwriters at Lloyd's*, No. 05–CV–6004, 2006 U.S. Dist. LEXIS 34177 (E.D.Pa. May 18, 2006).

The parties then pursued the arbitration proceedings.[6] Each party chose an arbitrator, and those two arbitrators chose a third arbitrator or umpire. Once formed, the three-member arbitration panel permitted discovery and briefing, and heard arguments in July 2007. The panel, however, after reviewing the evidence, receiving briefing, and hearing argument on the issue, excluded certain evidence that Century proffered relating to industry custom and the parties' past course of dealings. The panel predicated this determination on its belief that the evidence was irrelevant because it regarded the agreements as unambiguous and it believed that it could discern their meaning without looking beyond their terms. On December 12, 2007, over the dissent of the panel member that Century had chosen, a two-person panel majority issued a written opinion finding in Lloyd's's favor.

Century moved in the District Court to vacate the arbitrators' award, arguing that it had not agreed to submit its dispute with Lloyd's to arbitration and that, even if it did, the majority award was subject to vacatur on both procedural and substantive grounds under 9 U.S.C. § 10. On May 30, 2008, after hearing oral argument, the District Court denied the motion, a result that it reached by applying its prior

ruling compelling arbitration, which it refused to revisit, and by concluding that the arbitrators' decision did not evince a manifest disregard of the law. Century then appealed to this Court from the District Court's orders compelling arbitration and denying its motion to vacate the arbitrators' award.

## III. JURISDICTION AND STANDARD OF REVIEW

The District Court had subject-matter jurisdiction under 9 U.S.C. § 203 to determine whether the removed action related to a commercial arbitration agreement within the purview of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and 9 U.S.C. § 16(a)(3) over this appeal from the District Court's final decision respecting an arbitration subject to the Federal Arbitration Act.

 Our review of a district court's order compelling arbitration, an order presenting legal questions concerning an arbitration agreement's existence and scope, is plenary. *USW, AFL–CIO–CLC v. Rohm & Haas Co.*, 522 F.3d 324, 330, 330 n. 7 (3d Cir.2008); *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 176 (3d Cir.1999); *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 7 F.3d 1110, 1113 (3d Cir. 1993); *John F. Harkins Co. v. Waldinger Corp.*, 796 F.2d 657, 658–60 (3d Cir.1986). When reviewing a district court's order confirming an arbitration award, we review the district court's findings of fact for clear error and its legal conclusions de novo. *China Minmetals Materials Imp. & Exp. Co., Ltd. v. Chi Mei Corp.*, 334 F.3d 274, 278–79 (3d Cir.2003) (citing *First Options of Chicago, Inc. v. Kaplan*, 514

---

**6.** Century could not appeal immediately from the order compelling arbitration. *See* 9

U.S.C. § 16(b)(3); *Blair v. Scott Specialty Gases*, 283 F.3d 595, 599 (3d Cir.2002).

U.S. 938, 947–48, 115 S.Ct. 1920, 1925–26, 131 L.Ed.2d 985 (1995)).

## IV. DISCUSSION

Century raises two fundamental questions on this appeal. The first question is whether the parties had entered into a valid arbitration agreement such that the District Court properly compelled Century to arbitrate its dispute arising from the retrocessional agreements between Century and Lloyd's over Lloyd's's alleged obligation to reimburse Century for a portion of Century's payments to Argonaut for declaratory judgment expenses under the reinsurance treaties between Century and Argonaut. The second question, assuming that the District Court properly compelled arbitration, is whether the Court should have confirmed the arbitration panel's decision in favor of Lloyd's, even though the panel excluded the evidence that Century proffered to show past dealings and industry custom. We address each in turn.

### A. Whether the District Court Properly Compelled Arbitration Based on the Retrocessional Agreements' Incorporation of the Reinsurance Treaties

In addressing the first fundamental issue, whether the District Court properly compelled arbitration, we first outline the applicable principles of arbitration law, then explain certain standards that we apply, and finally turn to the agreements at issue in this case.

### 1. The Federal Arbitration Act

The Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. ("FAA"), creates a body of federal substantive law establishing and governing the duty to honor agreements to arbitrate disputes. *Green Tree Fin.*, 183 F.3d at 178–79 (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n. 32, 103 S.Ct. 927, 942 n. 32, 74 L.Ed.2d 765 (1983)). Congress designed the FAA to overrule the judiciary's longstanding reluctance to enforce agreements to arbitrate and its refusal to put such agreements on the same footing as other contracts, *Volt Information Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 474, 109 S.Ct. 1248, 1253, 103 L.Ed.2d 488 (1989); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443, 126 S.Ct. 1204, 1207, 163 L.Ed.2d 1038 (2006), and in the FAA expressed a strong federal policy in favor of resolving disputes through arbitration. *E.g., Moses H. Cone*, 460 U.S. at 24, 103 S.Ct. at 941; *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir.2009).[7] In particular, the FAA provides that as a matter of federal law "[a] written provision" in a maritime or commercial contract showing an agreement to settle disputes by arbitration "shall be valid, irrevocable, and enforceable, save upon such grounds as exist in law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA's second chapter, 9 U.S.C. §§ 201–208, implements the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *opened for signature* June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38, *reprinted in* 9 U.S.C. § 201 (historical and statutory notes) ("New York Convention"). *See Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 520 n. 15, 94 S.Ct. 2449, 2457 n. 15, 41 L.Ed.2d 270 (1974); *Standard Bent Glass Corp. v.*

---

[7]. To the extent that the courts' reluctance to enforce arbitration agreements was based on their parochial desire to safeguard their monopoly position with respect to the authority to resolve disputes, they may take solace from the circumstance that the adoption of the FAA and comparable state laws has given rise to its own body of litigation.

*Glassrobots Oy,* 333 F.3d 440, 448–49 (3d Cir.2003); *China Minmetals,* 334 F.3d at 279. Pursuant to this chapter, arbitration agreements fall within the New York Convention if they arise from commercial, legal relationships, such as commercial contracts, except when those relationships are entirely between United States citizens and otherwise are domestic in nature.[8] 9 U.S.C. § 202. Actions under the New York Convention are deemed to arise under the laws and treaties of the United States. 9 U.S.C. § 203. The FAA empowers district courts to compel arbitration in accordance with agreements, 9 U.S.C. § 206, and to enforce awards, 9 U.S.C. § 207, falling within the New York Convention. The domestic FAA applies to actions brought under the New York Convention to the extent that the two are not in conflict. 9 U.S.C. § 208; *China Minmetals,* 334 F.3d at 280. The strong federal policy favoring arbitration applies with special force in the field of international commerce. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth,* 473 U.S. 614, 631, 105 S.Ct. 3346, 3356, 87 L.Ed.2d 444 (1985).

## 2. Compelling Arbitration

■■ The strong federal policy favoring arbitration, however, does not lead automatically to the submission of a dispute to arbitration upon the demand of a party to the dispute. Before compelling a party to arbitrate pursuant to the FAA, a court must determine that (1) there is an agreement to arbitrate and (2) the dispute at issue falls within the scope of that agreement. *Kirleis,* 560 F.3d at 160 (citing *Trippe Mfg. Co. v. Niles Audio Corp.,* 401 F.3d 529, 532 (3d Cir.2005)); *China Minmetals,* 334 F.3d at 281. This determination applies equally in domestic and international arbitration contexts. *China Minmetals,* 334 F.3d at 282 (citing *Gen. Elec. Co. v. Deutz AG,* 270 F.3d 144, 152–56 (3d Cir.2001)).

■ For a court to compel arbitration, it initially must find that there is a valid agreement to arbitrate because the basis for contractual arbitration is consent, not coercion. *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 57, 115 S.Ct. 1212, 1216, 131 L.Ed.2d 76 (1995). Furthermore, the parties might agree to the resolution of some but less than all of their disputes arising out of a particular contract or relationship through arbitration, *see Volt Info. Scis.,* 489 U.S. at 479, 109 S.Ct. at 1256, and thus even if a court finds that the parties have agreed to arbitrate *some* disputes it must find, to order arbitration, that the parties have agreed to arbitrate the dispute in issue. Because an arbitrator's authority derives solely from the parties' agreement to submit their dis-

---

8. 9 U.S.C. § 202 states:
 An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in [9 U.S.C. § 2], falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.

 *See also Standard Bent Glass,* 333 F.3d at 448–49, 449 n. 13 (citing the New York Convention, Art. II, § 2) (An arbitration agreement falls within the New York Convention when the agreement (1) is an agreement in writing to arbitrate the subject of a dispute, (2) provides for arbitration in the territory of a signatory to the Convention, (3) arises out of a legal relationship, contractual or not, that is considered commercial, and (4) is a legal relationship between parties at least one of which is not an American citizen, or at least is a legal relationship bearing some reasonable relation with one or more foreign states).

putes to arbitration, *AT & T Technologies, Inc. v. Comm'ns Workers,* 475 U.S. 643, 648–49, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986), a party cannot be compelled to submit a dispute to arbitration unless it has agreed to do so. *U.S. Small Bus. Admin. v. Chimicles,* 447 F.3d 207, 209 (3d Cir.2006); *China Minmetals,* 334 F.3d at 289–90.[9]

■ To determine whether the parties have agreed to arbitrate, we apply "ordinary state-law principles that govern the formation of contracts." *First Options,* 514 U.S. at 944, 115 S.Ct. at 1924; *Perry v. Thomas,* 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 2527 n. 9, 96 L.Ed.2d 426 (1987); *see Deutz AG,* 270 F.3d at 154–55 (explaining that principles of *First Options* apply in international as well as domestic arbitration context). These principles must govern contracts generally; a state-law principle that takes its meaning from the fact that an agreement to arbitrate is at issue does not comport with section 2 of the FAA and therefore is preempted. *Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 686–88, 116 S.Ct. 1652, 1655–56, 134 L.Ed.2d 902 (1996) (citing *Perry,* 482 U.S. at 492 n. 9, 107 S.Ct. at 2527 n. 9); *Gay v. CreditInform,* 511 F.3d 369, 394 (3d Cir. 2007).

■ Inasmuch as "federal law applies to the interpretation of arbitration agreements," once a court has found that there is a valid agreement to arbitrate, regardless of whether the action is in a federal or a state court the determination of whether "a particular dispute is within the class of those disputes governed by the arbitration clause ... is a matter of federal law." *China Minmetals,* 334 F.3d at 290 (internal citations and quotation marks omitted). *See Gay,* 511 F.3d at 388;

*Green Tree Fin. Corp.,* 183 F.3d at 178–79. In determining whether the particular dispute falls within a valid arbitration agreement's scope, "there is a presumption of arbitrability[:] an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T Techs.,* 475 U.S. at 650, 106 S.Ct. at 1419 (internal quotation marks and citations omitted). *See Rohm & Haas,* 522 F.3d at 331 (citing *AT & T Techs.*).

3. **Whether the Retrocessional Agreements' Incorporation–by–Reference Language Effected a Valid Agreement to Arbitrate Between Century and Lloyd's**

With these general principles in mind, we turn to the first of the two determinations necessary to decide whether the District Court properly compelled arbitration: is there a valid agreement between Century and Lloyd's to arbitrate their disputes? *See Kirleis,* 560 F.3d at 160. As we have indicated, Lloyd's does not rely on the retrocessional agreements alone as a basis for contending that there was an agreement to arbitrate for it could not do so inasmuch as those agreements do not include arbitration clauses. Instead, Lloyd's asserts that Century is bound to arbitrate under an incorporation-by-reference theory, a common device in layered contracts likely to be in use in construction projects in which there are contractors, subcontractors, and sureties and, as here, when insurance companies spread risk among themselves. According to Lloyd's, even though it was not a signatory to the original reinsurance treaties, it still may seek to compel Century to arbitrate based on

---

**9.** We are not concerned here with the unusual situation in which an act of legislation compels the parties to arbitrate a dispute. *See, e.g.,* 29 U.S.C. § 1401(a)(1).

the reinsurance treaties' arbitration clauses because the retrocessional agreements incorporated all of the provisions of the reinsurance treaties, including their arbitration clauses, thereby creating a valid agreement between Century and Lloyd's to arbitrate disputes arising from the retrocessional agreements.

### a. Two Threshold Issues Regarding the Standards That Apply When Determining Whether There Is a Valid Agreement to Arbitrate

Before we consider Lloyd's's incorporation-by-reference contention, we consider two threshold questions concerning the legal standard that applies when determining whether there is a valid agreement to submit a dispute to arbitration. The first issue is whether the presumption in favor of arbitration applies to both or only the second of the two questions: (1) is there an agreement to arbitrate and (2) does the particular dispute fall within the existing agreement's scope? The second issue is whether the "express" and "unequivocal" standard to which courts have referred in arbitration cases requires more of arbitration agreements than it does of other contracts.

### (1) Whether the Presumption in Favor of Arbitration Applies to the Initial Question Whether the Parties Agreed to Arbitrate

The strong federal policy in favor of arbitration manifests itself in a presumption favoring arbitration. But the parties dispute whether this presumption applies to both or only the latter of the questions (1) whether there is a valid arbitration agreement between the parties and (2) whether a particular merits-based dispute must be arbitrated because it is within the scope of the valid arbitration agreement. *See Kirleis*, 560 F.3d at 160. Though Century acknowledges that there is a policy favoring arbitration that results in a presumption that a particular merits-based dispute is arbitrable, it argues that the presumption does not apply to the threshold determination of whether the parties agreed to arbitrate in the first place. Lloyd's, on the other hand, argues that the presumption applies to both questions. *See Trippe*, 401 F.3d at 532 ("When determining *both* the existence and the scope of an arbitration agreement, there is a presumption in favor of arbitrability.") (emphasis added). Though we do not agree with the District Court's approach on this point in which it relied on *Trippe* to conclude that the presumption applies to both questions, we acknowledge that it was not unreasonable for it to take that approach.

In *Trippe*, we addressed the question whether an audio-equipment company could compel a manufacturer to arbitrate their dispute pursuant to an arbitration clause in a distribution agreement between the audio-equipment company and a third party, even though the manufacturer was not a signatory to that agreement. *Id.* at 530–32. The audio-equipment company claimed that it could compel arbitration based on a separate asset-purchase agreement between the manufacturer and the third party under which the manufacturer assumed certain of the third party's assets and liabilities. *Id.* Applying New York contract-law principles, we held that the manufacturer was bound to arbitrate claims arising out of obligations it had assumed expressly through the asset-purchase agreement, but not those claims based on obligations that the manufacturer had not assumed expressly, because under New York law an assignee that has assumed an assignor's liabilities contained in an underlying agreement is bound by an arbitration clause in that agreement. *Id.* at 532–33.

Before reaching this conclusion, however, we stated in *Trippe* that "[w]hen determining both the existence and the scope of an arbitration agreement, there is a presumption in favor of arbitrability." *Id.* at 532. We then quoted from *AT & T Technologies*, 475 U.S. at 650, 106 S.Ct. at 1419: "An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Trippe*, 401 F.3d at 532 (internal quotation marks omitted).

But, as Century argues, the quotation in *Trippe* from *AT & T Technologies* obscures the context of the quotation. There the Supreme Court stated:

> where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

*AT & T Techs.*, 475 U.S. at 650, 106 S.Ct. at 1419 (internal citations and quotations omitted). Critically, the presumption of arbitrability that the Supreme Court recognized applies "where the contract contains an arbitration clause"—that is, where it has been determined that there is a valid agreement to arbitrate. *Cf. Volt Info. Scis.*, 489 U.S. at 475, 109 S.Ct. at 1253 (the federal policy in favor of arbitration requires that "ambiguities as to the scope of the arbitration clause itself [be] resolved in favor of arbitration").

 But the question whether this presumption applies to the threshold inquiry which requires a determination whether there is an agreement to arbitrate in the first place is another matter. The FAA does not require parties to arbitrate a dispute when they have not agreed to do so. *Id.* at 478, 109 S.Ct. at 1255. The "liberal federal policy favoring arbitration agreements ... is at bottom a policy guaranteeing the enforcement of private contractual arrangements." *Mitsubishi*, 473 U.S. at 625, 105 S.Ct. at 3353 (internal citations and quotations omitted). Because "arbitration is a matter of contract[,] a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs.*, 475 U.S. at 648, 106 S.Ct. at 1418 (internal citations and quotations omitted). *See China Minmetals*, 334 F.3d at 281.

Therefore, some of the language in *Trippe* may be misleading to the extent it suggests that there is a presumption in favor of arbitration in the absence of an agreement to arbitrate. As we have stated both before *Trippe* and since, a party cannot be compelled to arbitrate unless that party has entered into a written agreement to arbitrate that covers the dispute. *Kirleis*, 560 F.3d at 160; *Chimicles*, 447 F.3d at 209; *China Minmetals*, 334 F.3d at 289–90. We determine whether a party has done so by applying "ordinary state-law principles that govern the formation of contracts," not by applying a presumption in favor of arbitration. *First Options*, 514 U.S. at 944, 115 S.Ct. at 1924. *See Kirleis*, 560 F.3d at 160.

Several other courts of appeals have made it clear that in their view the presumption in favor of arbitration applies to the question whether a particular dispute falls within an existing agreement's scope, but not to the threshold question as to the existence of an agreement between the parties to arbitrate. *See Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 381 (5th Cir.2008) ("We apply the federal policy favoring arbitration when addressing ambiguities regarding whether a question

falls within an arbitration agreement's scope, but we do not apply this policy when determining whether a valid agreement exists."); *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir.2002) ("The presumption in favor of arbitration is properly applied in interpreting the scope of an arbitration agreement; however, this presumption disappears when the parties dispute the existence of a valid arbitration agreement.") (citing *First Options*, 514 U.S. at 944–45, 115 S.Ct. at 1924); *McCarthy v. Azure*, 22 F.3d 351, 355 (1st Cir. 1994) (Once agreement between parties has been proven, "the federal policy favoring arbitration requires that any doubts concerning the scope of an arbitrable issue be resolved in favor of arbitration," but this policy "does not extend to situations in which the identity of the parties who have agreed to arbitrate is unclear.") (internal quotation marks omitted) (citing *Moses H. Cone*, 460 U.S. at 24–25, 103 S.Ct. at 941–42, and *PaineWebber, Inc. v. Hartmann*, 921 F.2d 507, 511 (3d Cir.1990)); *Grundstad v. Ritt*, 106 F.3d 201, 205 n. 5 (7th Cir.1997) ("[T]he federal policy favoring arbitration applies to issues concerning the scope of an arbitration agreement entered into consensually by contracting parties; it does not serve to extend the reach of an arbitration provision to parties who never agreed to arbitrate in the first place.") (citing *McCarthy*, 22 F.3d at 355).

We are satisfied that to decide whether a party may be compelled to arbitrate a dispute with another party, we must determine (1) whether there is a valid agreement to arbitrate between the parties and, if so, (2) whether the merits-based dispute in question falls within the scope of that valid agreement. *Kirleis*, 560 F.3d at 160. The presumption in favor of arbitration

applies to the second question but probably does not apply to the first question. *Id.; Chimicles*, 447 F.3d at 209; *see China Minmetals*, 334 F.3d at 280–81. Though we have addressed the question of the applicability *vel non* of the presumption in determining if there is a valid agreement to arbitrate, we have done so because the District Court addressed the point and the law as we have set it forth on the point in various cases is unclear. We, however, need not reach a definitive conclusion on the breadth of the presumption in favor of arbitration, because even without applying the presumption in this case we conclude that the parties entered into a valid agreement to arbitrate.

### (2) The "Express" and "Unequivocal" Standard

A second issue that we address is the standard applied to determine whether there is an agreement to arbitrate. Century asserts that we have required arbitration agreements to be "express" and "unequivocal" before compelling arbitration, this standard "has prevailed for decades," Appellant's opening br. at 21, and the purported agreement here is unenforceable because it fails to meet that standard. *See Kaplan v. First Options*, 19 F.3d 1503, 1512 (3d Cir.1994) (stating the rule that an arbitration agreement "must be 'express' and 'unequivocal' ") (quoting *Par–Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir.1980)), *aff'd on other grounds*, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).[10]

In *Par–Knit Mills*, we considered whether a distributor could compel a manufacturer to arbitrate their dispute over a series of oral sales contracts pursuant to a related, written sales contract's

---

**10.** *See also Kirleis*, 560 F.3d at 159, 161; *China Minmetals*, 334 F.3d at 282; *Standard Bent Glass*, 333 F.3d at 446; *Sandvik AB v.*

*Advent Int'l Corp.*, 220 F.3d 99, 106 (3d Cir. 2000).

arbitration clause signed by one of the manufacturer's production managers. The manufacturer denied ever agreeing to arbitrate, claiming, instead, that its production manager had signed the contracts intending to confirm the goods' delivery dates but not to obligate the corporation to the written contracts' various terms, including the arbitration clause. *Par-Knit Mills*, 636 F.2d at 53. The manufacturer supported this claim with an affidavit. *Id.* We held that the district court erred in compelling arbitration because the manufacturer's unequivocal denial that it had agreed to arbitrate, accompanied by a supporting affidavit, created a genuine issue of fact requiring a jury determination of whether there in fact had been a "meeting of the minds" resulting in the formation of an agreement to arbitrate. *Id.* at 54–55.

We explained that the genuine issue of fact as to the parties' intent prevented the court from finding, as a matter of law, that the parties had formed an agreement to arbitrate, and therefore also prevented the court from compelling arbitration on that basis:

> Before a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect. If there is doubt as to whether such an agreement exists, the matter, upon a proper and timely demand, should be submitted to a jury. Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement. The district court, when considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate had been made between the parties, should give to the opposing party the benefit of all reasonable doubts and inferences that may arise.

*Par-Knit Mills*, 636 F.2d at 54 (citations and footnotes omitted). In *Par-Knit Mills*, there was a genuine issue of fact as to whether the production manager was authorized to execute agreements to arbitrate on behalf of the corporation, and so the court, upon the manufacturer's proper and timely demand, was required to submit the question of the agreement's existence to a jury. *Id.* at 54–55. As we noted, this is the familiar summary judgment standard, *see* Fed.R.Civ.P. 56(c), and it applies in cases such as *Par-Knit Mills* because the district court's order compelling arbitration is "in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate." *Par-Knit Mills*, 636 F.2d at 54 n. 9; *see* 9 U.S.C. § 4 (district court should not order arbitration unless it is "satisfied that the making of arbitration agreement ... is not in issue").[11]

**11.** 9 U.S.C. § 4 provides in part that, upon a party's valid petition to compel arbitration,

> [t]he court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury

Following *Par–Knit Mills*, we have referred to the requirement that an agreement be "express" and "unequivocal" before a court may compel a party to arbitrate in the context of emphasizing that a genuine issue of fact regarding the arbitration agreement's existence—such as where the contract language is ambiguous or where one party claims that it never received the terms of an agreement, that the agreement was forged, or that the agreement was signed by a person lacking authority to execute the contract—prevents a district court from summarily compelling arbitration.[12] *E.g., Kirleis,* 560 F.3d at 159 (citing *Par–Knit Mills*); *Standard Bent Glass,* 333 F.3d at 446 ("Arbitration clauses must be clear and unequivocal. Genuine issues of fact will preclude an order to arbitrate."); *cf. Emerson Radio Corp. v. Orion Sales, Inc.,* 253 F.3d 159, 163–64 (3d Cir.2001) (discussing determination of a contract's ambiguity).

Our cases, however, seem inconsistent in this respect: we sometimes have regarded *Par–Knit Mills'* "express" and "unequivocal" language as stating a substantive standard required of arbitration agreements to be enforceable, seemingly without regard to the procedural posture of the case. In particular, in *First Options,* 19 F.3d at 1512, we stated that no party can be compelled to arbitrate unless that party has entered into an agreement to do so, and we relied on *Par–Knit Mills* in stating that "[t]hat agreement must be 'express' and 'unequivocal.'" *First Options,* 19 F.3d at 1512 (quoting *Par–Knit Mills*). Notably, this statement can be read to treat the "express" and "unequivocal" standard as a substantive requirement that a purported arbitration agreement must meet before a party may be compelled to submit a dispute to arbitration regardless of whether there is a disputed issue of fact as to the agreement's existence. Some of our cases have relied on this view of *Par–Knit Mills'* "express" and "unequivocal" language as a substantive requirement to explain how parties may be bound by arbitration agreements, even if they are not signatories to those particular agreements:

> [t]he identification of the parties bound by the agreement to arbitrate need not be confined to the limited inquiry of identifying the signatories to the arbitration agreement. Rather, the dispositive finding is an 'express' and 'unequivocal' agreement between parties to arbitrate their disputes.

---

trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof.

**12.** In *Kirleis,* 560 F.3d at 159–64, there was a genuine issue of material fact with respect to the agreement to arbitrate because a party's

unopposed affidavit stated that the party never had received the document containing the arbitration provision and never had consented to it. *See also China Minmetals,* 334 F.3d at 281 (noting that party's claim that underlying contract was forged would create a genuine factual issue); *Deutz AG,* 270 F.3d at 153 (upholding district court's submission to jury issue whether parties had formed arbitration agreement, where contract was ambiguous as to parent corporation's obligation to arbitrate); *Sandvik AB v. Advent Int'l Corp.,* 220 F.3d 99, 101–02, 106–10 (3d Cir.2000) (affirming district court's denial of motion to compel arbitration pending resolution of factual issue of whether signatory was authorized to bind corporation).

*In re Prudential Ins. Co.*, 133 F.3d 225, 229 (3d Cir.1998) (internal quotation marks partially omitted) (quoting *First Options,* 19 F.3d at 1512). *See also First Liberty Inv. Group v. Nicholsberg,* 145 F.3d 647, 650 (3d Cir.1998) (quoting the above from *In re Prudential,* 133 F.3d at 229); *cf. Allstate Settlement Corp. v. Rapid Settlements Ltd.,* 559 F.3d 164, 170 (3d Cir.2009) (citing *Trippe,* 401 F.3d at 532) (discussing theories under which arbitration agreement may bind nonsignatory).

We therefore have used the "express" and "unequivocal" language in two different ways when considering whether there is an agreement to arbitrate. On the one hand, we have stated the "express" and "unequivocal" requirement to explain that genuine issues of fact as to whether there is an agreement to arbitrate preclude compelling a party to submit to arbitration;[13] on the other, we have used this language to state a substantive standard that applies to the determination of an arbitration agreement's enforceability as a general matter.

Turning to the facts at hand, application of the "express" and "unequivocal standard" cannot be in issue in this case because there is "no genuine issue of fact concerning the formation of the agreement"—Century and Lloyd's instead dispute the legal effect of the uncontested contractual language—and thus if the "express" and "unequivocal" requirement can be in issue here it only can be if that standard is a substantive requisite for an enforceable arbitration agreement. *See* Appellant's opening br. at 15; Appellee's br. at 16.

In view of the absence of a dispute of facts, this case involves contract construction and therefore requires a legal determination. We reiterate that there is not a disputed issue of fact here as Century does not make an assertion such as that the retrocessional agreements were forged, the signatory lacked authority to bind Century, or the actual words of the contracts are ambiguous.[14] Thus, it is not surprising that Century does not seek a jury trial to determine the parties' intent with respect to the obligation to arbitrate and does not ask us to remand for that purpose. Inasmuch as this case involves contract construction, i.e., determining the legal effect of the retrocessional agreements' incorporation-by-reference language, we reiterate that the "express" and "unequivocal" standard we recognized in *Par–Knit Mills* is inapposite here to the extent that the standard requires that there not be a genuine issue of material fact as to an arbitration agreement's existence before a district court may determine whether the agreement exists as a matter of law and then, if it does, to compel arbitration based on the agreement.

Century nevertheless presses the "express" and "unequivocal" language as a substantive standard. Accordingly, Century relies on the rule that we stated in *First*

---

**13.** This is not to say that after the trier of the facts resolves the dispute a court, depending on what the trier of the facts determines, cannot order that the parties submit to arbitration.

**14.** It is important to recognize that we are not suggesting an absence of a dispute of fact as to the parties' substantive rights and obligations under their agreements with respect to the questions the arbitrators addressed. In fact, there was such a dispute and Century offered evidence to show that the retrocessional agreements were ambiguous as to the parties' intent with respect to Lloyd's's liability for the declaratory judgment expenses underlying this litigation. Indeed, we consider that dispute when addressing the second fundamental question on this appeal, i.e., whether the District Court should have confirmed the award even though the arbitrators rejected certain evidence that Century offered.

*Options,* 19 F.3d at 1512. *E.g.,* Appellant's opening br. at 21 ("The written agreement to arbitrate must be 'express' and 'unequivocal.'") (quoting *First Options,* 19 F.3d at 1512). But there are two problems with this position. First, the Supreme Court implicitly may have rejected the "express" and "unequivocal" standard as a substantive rule. Upon reviewing our opinion in *First Options,* after granting certiorari as to two issues presented in our Court, the Supreme Court affirmed but did so without approving a substantive "express" and "unequivocal" standard. Instead, the Supreme Court set forth the following guidelines with regard to determining whether there is an arbitration agreement between the parties:

> When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally (though with a qualification we discuss below) should apply ordinary state-law principles that govern the formation of contracts. The relevant state law here, for example, would require the court to see whether the parties objectively revealed an intent to submit the arbitrability issue to arbitration.

*First Options,* 514 U.S. at 944, 115 S.Ct. at 1924 (internal citations omitted); *cf. First Options,* 19 F.3d at 1512 (quoting *Par-Knit Mills* for the rule that to be valid an arbitration agreement "must be 'express' and 'unequivocal'"). The "qualification" that the Supreme Court mentioned relates to the question of who has the primary power to decide the question of arbitrability, an issue not presented in the dispute between Century and Lloyd's. *First Options,* 514 U.S. at 944–45, 115 S.Ct. at 1925–26; *see id.* at 942, 115 S.Ct. at 1923 (distinguishing between disagreements over (1) a dispute's merits, (2) the arbitrability of the dispute, and (3) who should have the primary power to decide the arbitrability of the dispute).

But a study of the two opinions suggests that the Supreme Court, far from adopting the substantive requirement that arbitration provisions must be "express" and "unequivocal" to be valid, in fact rejected it. *See First Options,* 514 U.S. at 944, 115 S.Ct. at 1924; *Blair,* 283 F.3d at 603 (citing *First Options,* 514 U.S. at 944, 115 S.Ct. at 1924) ("A federal court must generally look to the relevant state law on the formation of contracts to determine whether there is a valid agreement to arbitrate under the FAA."); *Kirleis,* 560 F.3d at 160 (citing *First Options,* 514 U.S. at 944, 115 S.Ct. at 1924, and *Blair,* 283 F.3d at 603).

And there is a second problem with Century's position. Even if the Supreme Court in *First Options* did not reject the "express" and "unequivocal" standard outright to the extent that it is substantive— i.e., the burden of persuasion applied to whether arbitration agreements exist generally, rather than the summary judgment standard applied in the arbitration context—the applicable statutory language and other Supreme Court precedent preclude us from requiring arbitration agreements to be "express" and "unequivocal" in order to be enforced. Section 2 of the FAA declares that written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of *any* contract." 9 U.S.C. § 2 (emphasis added). It is therefore not surprising that the Supreme Court has explained that threshold limitations placed specifically and solely on arbitration provisions are antithetical to the goals and policies of the FAA. *Doctor's Assocs.,* 517 U.S. at 687–88, 116 S.Ct. at 1656; *see Gay,* 511 F.3d at 394. It thus follows that requiring arbitration clauses to meet more exacting standards than those imposed by the applicable state-law principles on contracts generally would offend Congress's purpose in

enacting the FAA: to put arbitration provisions "upon the same footing as other contracts." *Doctor's Assocs.*, 517 U.S. at 687, 116 S.Ct. at 1656 (citing *Scherk,* 417 U.S. at 511, 94 S.Ct. at 2453 (internal quotation marks omitted) (stating that FAA's purpose is to "revers[e] centuries of judicial hostility to arbitration agreements")); *Perry,* 482 U.S. at 492 n. 9, 107 S.Ct. at 2527 n. 9; *cf. Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela,* 991 F.2d 42, 46 (2d Cir. 1993) (holding that FAA preempted state law requiring that there be an "express, unequivocal agreement" to arbitrate before parties would be compelled to arbitrate dispute—a higher standard than that which applied to contracts generally—because "[a] court may not, in assessing the rights of litigants to enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law").

■■■ A substantive "express" and "unequivocal" standard impermissibly would require more of arbitration agreements than of contracts generally to be enforced whenever the standard differed from the applicable state-law principles of contract law. *See Progressive Cas.,* 991 F.2d at 46. Of course, application of the standard in practice always or almost always would differ from ordinary state-law contract principles, as courts enforce contracts that are something less than "express" and "unequivocal." Indeed, sometimes courts enforce contracts that rather than being "express" and "unequivocal" simply are implied in law.[15]

In sum, when determining whether there is a valid agreement to arbitrate between the parties, the first part of the two-step inquiry, we apply ordinary state-law principles of contract law. *First Options,* 514 U.S. at 944, 115 S.Ct. at 1924. Because the FAA requires us to place arbitration agreements on an equal footing with other contracts when determining whether the parties have agreed to arbitrate, we cannot subject a purported arbitration agreement otherwise within the scope of the FAA and satisfying its requirements to a standard more demanding than that which we would apply to other agreements under the applicable state law. To be sure, genuine issues of fact preclude summary judgment when determining whether there is an agreement to arbitrate, just as they do when determining the existence of any other contract. *See* Fed.R.Civ.P. 56(c). But the FAA and Supreme Court precedent forbid us from placing more stringent requirements on arbitration agreements otherwise satisfying the criteria of the FAA than on other contracts, such as a substantive requirement that an arbitration agreement be "express" and "unequivocal" to be enforceable, rather than the standard that applies to contracts generally.[16]

**b. Whether Century and Lloyd's Agreed to Arbitrate Disputes Arising from the Retrocessional Agreements**

Having addressed these two preliminary issues—whether the presumption in favor

---

**15.** Of course, in one respect Congress itself requires that arbitration agreements be subject to more exacting standards than most contracts as 9 U.S.C. § 2 requires that arbitration agreements be in writing to be enforced, and thus the FAA includes a requirement akin to a statute of frauds which states enact to require that some but far less than all contracts be in writing to be enforceable.

**16.** It is not too much to state that enforcement of a substantive requirement that an agreement to provide for arbitration must be "express" and "unequivocal" would be a partial reincarnation of the courts' pre-FAA hostility to arbitration.

of arbitration applies to the initial question whether the parties agreed to arbitrate (it probably does not), and whether in answering this question we apply the substantive requirement based on our caselaw that an agreement to arbitrate be "express" and "unequivocal" to be valid and enforceable (we cannot)—we return to the initial question: whether Century and Lloyd's agreed to arbitrate certain disputes, for if they did not do so this case should not have been arbitrated. As we have stated, to determine whether the parties agreed to submit any disputes to arbitration, we apply "ordinary state-law principles that govern the formation of contracts." *First Options,* 514 U.S. at 944, 115 S.Ct. at 1924; *see also Perry,* 482 U.S. at 492 n. 9, 107 S.Ct. at 2527 n. 9; *Kirleis,* 560 F.3d at 160.

### (1) Choice of Law: Pennsylvania Law Applies

▮ The question whether the parties agreed to arbitrate certain disputes raises a choice-of-law issue. Though neither party explicitly states that Pennsylvania law applies to the question whether there is a valid arbitration agreement, they seem to agree that Pennsylvania law does apply, because, apart from federal cases, each predominantly cites Pennsylvania state court cases on the issues in this case. Moreover, the retrocessional agreements' service-of-suit clause contains a choice-of-law provision stating that "all matters arising [from disputes brought pursuant to the service-of-suit clause] shall be determined in accordance with the law and practice of [the] Court" where the action is brought. App. at 32. This provision suggests that to the extent that federal law does not control this action, we should resolve this dispute over payments under the retroces-

sional agreements in accordance with the substantive law of Pennsylvania, the state in which Century filed suit. Moreover, under that law the law of the state in which an insurance contract is made governs the contract. *Crawford v. Manhattan Life Ins. Co.,* 208 Pa.Super. 150, 221 A.2d 877, 880 (1966). The retrocessional agreements were signed in duplicate in Pennsylvania and in England. So even if the provision dictated only that Pennsylvania's choice-of-law rules applied, under those rules Pennsylvania substantive law still would govern.[17]

### (2) Principles of Pennsylvania Contract Law

▮ We thus apply Pennsylvania contract-law principles to determine whether the parties formed an agreement to arbitrate. *First Options,* 514 U.S. at 944, 115 S.Ct. at 1924; *Perry,* 482 U.S. at 492 n. 9, 107 S.Ct. at 2527 n. 9; *Kirleis,* 560 F.3d at 160 (internal citations omitted); *see Murphy v. Duquesne Univ. of the Holy Ghost,* 565 Pa. 571, 777 A.2d 418, 429–30 (2001) (discussing fundamental principles of contract interpretation under Pennsylvania law); *Quiles v. Fin. Exch. Co.,* 879 A.2d 281, 285 (2005) (equating principles for interpreting agreements to arbitrate with general principles of contract interpretation). In general, to determine whether a contract was formed under Pennsylvania law, a court must look to: (1) whether both parties manifested an intention to be bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration. *Blair,* 283 F.3d at 603; *Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd.,* 559 Pa. 56, 739 A.2d 133, 136 (1999); *Quiles,* 879 A.2d at 285. The Pennsylva-

---

**17.** Even though the retrocessional agreements were signed in duplicate in Pennsylvania and in England, neither party asserts that English law applies here.

nia Superior Court has explained that "[i]n determining whether the parties agreed to arbitrate, courts should apply rules of contractual construction, adopting an interpretation that gives paramount importance to the intent of the parties and ascribes the most reasonable, probable, and natural conduct to the parties." *Id.* at 287–88.

### (3) Binding Nonsignatories Through Incorporation by Reference

■■■ We reiterate that even though the retrocessional agreements do not include an arbitration provision, Lloyd's asserts that they incorporated the arbitration provision from the reinsurance treaties between Argonaut and Century and therefore Century and Lloyd's agreed to arbitrate their disputes. Pennsylvania courts have recognized the incorporation-by-reference theory generally. "As a matter of contract law, incorporation by reference is generally effective to accomplish its intended purpose where ... the provision to which reference is made has a reasonably clear and ascertainable meaning." *Bernotas v. Super Fresh Food Mkts., Inc.,* 816 A.2d 225, 231 (2002) (internal quotation marks omitted), *rev'd on other grounds,* 581 Pa. 12, 863 A.2d 478 (2004). *See Roman Mosaic & Tile Co. v. Thomas P. Carney, Inc.,* 729 A.2d 73, 77–78 (1999) (subcontractor bound by terms of general contract incorporated by reference into subcontract). As is significant here, Pennsylvania courts have recognized incorporation-by-reference provisions in an arbitration context. *Integrated Project Servs. v. HMS Interiors, Inc.,* 931 A.2d 724, 734–36 (2007) (discussing *Bernotas* and distinguishing between enforceable incorporation or "pass-through" clauses, such as those incorporating general contract's arbitration clause into subcontract, from unenforceable pass-through clauses purporting to hold indemnitor liable for indemnitee's negligence); *Cumberland–Perry Area Vocational–Technical Sch. Auth. v. Bogar & Bink,* 261 Pa.Super. 350, 396 A.2d 433, 435 n. 1 (1978) (subcontractor bound by general contract's arbitration provision incorporated into subcontract to which subcontractor was a party).

We note that the Pennsylvania Supreme Court in *Bernotas* held that a contract's general incorporation clause will not incorporate another contract's indemnification provisions absent express and specific contract language to that effect because of the longstanding policy to construe indemnification provisions narrowly. *Bernotas,* 863 A.2d at 484 (concluding that, because courts traditionally construe indemnification provisions narrowly, subcontract's standard incorporation clause was insufficient to incorporate general contract's indemnification clause against subcontractor to hold subcontractor liable for general contractor's negligence). But we see no reason to apply that reasoning to the very different question of whether an agreement's incorporation-by-reference provision applies so as to incorporate an arbitration clause, because such a clause is quite different from an indemnification clause.

■■■ In sum, under Pennsylvania law, arbitration provisions, like other contractual provisions, may be incorporated by reference through general incorporation provisions. We note that, like the Pennsylvania courts, we have recognized incorporation by reference as one theory for binding nonsignatories to arbitration agreements. *Allstate Settlement,* 559 F.3d at 170 (citing *Trippe,* 401 F.3d at 532).[18]

---

**18.** In *Allstate Settlement,* we explained that

"we have recognized five theories for binding

At bottom, the question remains one of the effect of the parties' action in incorporating the reinsurance agreements, including their arbitration clause, as embodied in the agreements themselves, to be determined by reference solely to the contents of the agreements.

### c. Construing the Retrocessional Agreements Under Pennsylvania Law

There can be no question that the terms of the written, signed retrocessional agreements are quite definite. *See Blair,* 283 F.3d at 603. There is no dispute that the reinsurance treaties and the retrocessional agreements are valid contracts and that they are mutually supported by consideration. *Id.* ("When both parties have agreed to be bound by arbitration, adequate consideration exists and the arbitration agreement should be enforced."). Our task, therefore, is to construe the contracts to determine the effect of the parties' inclusion of the incorporation-by-reference provision solely by examining the agreements' contents. The question is limited to contract construction: does the retrocessional agreements' incorporation language result in an agreement between the parties to arbitrate their disputes? *See* Appellant's opening br. at 15; Appellee's br. at 16. Lloyd's emphasizes the retrocessional agreements' expansive incorporation clause and argues that we. should construe the retrocessional agreements to have incorporated "all" of the reinsurance treaties' provisions, including the arbitration clause, because that is precisely what the incorporation clause says. On the oth-

er hand, Century emphasizes the phrasing of the reinsurance treaties' arbitration clause and argues that we should not construe the retrocessional agreements to have incorporated the arbitration agreement because the incorporated arbitration clause specifies that it applies only to Century and Argonaut, *see Progressive Casualty,* 991 F.2d at 45–48, and the purpose of the incorporation was to clarify the parties' obligations under the reinsurance agreements, not to agree to a procedure for the resolution of disputes. *See AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co.,* 242 F.3d 777, 780–82 (8th Cir.2001). We address each position in turn.

### d. Three Surety Cases in Which General Incorporation Provisions Effectively Incorporate Arbitration Agreements

Lloyd's argues that because the retrocessional agreements provide that "all" terms and provisions of the reinsurance treaties apply to the retrocessional agreements, the parties must have provided for all of the treaties' terms, including the arbitration clause, to apply to the retrocessional agreements. In support of this contention Lloyd's relies for the most part on a set of surety cases in the federal courts to argue that a contract's general incorporation clause effectively can incorporate the underlying contract's provisions, including its arbitration clause. *United States Fidelity & Guaranty Co. v. West Point Constr. Co.,* 837 F.2d 1507 (11th Cir.1988) (per curiam); *Exchange Mut. Ins. Co. v. Haskell Co.,* 742 F.2d 274 (6th Cir.1984) (per curiam); *Commercial Un-*

---

nonsignatories to arbitration agreements: (1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing/alter ego, and (5) estoppel." *Allstate Settlement,* 559 F.3d at 170 (citing *Trippe,* 401 F.3d at 532) (internal quotations omitted); *see also, e.g., Mundi v. Union Sec. Life Ins. Co.,* 555 F.3d 1042, 1045

(9th Cir.2009); *Bridas S.A.P.I.C. v. Gov't of Turkmenistan,* 345 F.3d 347, 356 (5th Cir. 2003); *MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC,* 268 F.3d 58, 61 (2d Cir.2001); *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH,* 206 F.3d 411, 416–17 (4th Cir.2000).

*ion Ins. Co. v. Gilbane Bldg. Co.*, 992 F.2d 386 (1st Cir.1993). Lloyd's contends that we should follow these cases to hold that a party to a contract containing an arbitration clause, such as the reinsurance treaties in this case, may be compelled pursuant to that contract's arbitration clause to arbitrate a dispute with a third party arising under a second contract, such as the retrocessional agreements in this case, where the second contract incorporated the first contract's terms through a general incorporation-by-reference clause.

In *West Point Construction* the general contractor sought to compel a subcontractor's surety to arbitrate a dispute pursuant to a performance bond that incorporated by reference a subcontract between the general contractor and a subcontractor. There were three relevant agreements. The first agreement was the general contract between a county as the owner and the general contractor to build a county justice center. This general contract contained an arbitration clause. The second agreement was the subcontract between the general contractor and the subcontractor. This subcontract contained its own arbitration clause as well as a separate provision modifying that clause by referring to the general contract's arbitration clause. The third agreement was the performance bond that the surety issued to the general contractor on behalf of the subcontractor. This performance bond incorporated the subcontract by reference and made the subcontractor's performance under the subcontract a condition of the bond.

After the subcontractor defaulted, the general contractor sought to recover against the surety and moved to compel arbitration. The surety argued that the performance bond's incorporation-by-reference clause did not incorporate the arbitration clause from either the subcontract

or the general contract. The Court of Appeals for the Eleventh Circuit disagreed, holding that because the subcontract was referred to in and made part of the bond, disputes arising under the bond—including disputes concerning the adequacy of the subcontractor's performance under the subcontract, a condition of the performance bond—were subject to arbitration pursuant to the arbitration provisions of the subcontract. *West Point Constr.*, 837 F.2d at 1508. The court found that, in these circumstances, "the incorporation of the subcontract into the bond expresses an intention of the parties, including [the surety], to arbitrate disputes." *Id.*

Similarly, in *Haskell*, a case involving the construction of a shopping center, the Court of Appeals for the Sixth Circuit considered whether to enjoin arbitration between a surety and the prime contractor. One of the relevant agreements was the general contract between the general contractor and the owner-developer to build the shopping center. The general contract contained an arbitration clause stating:

> All claims, disputes and other matters in question arising out of, or relating to this contract or the breach thereof ... which cannot be settled by negotiation between the Contractor and the Owner, shall be decided in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association.

*Haskell*, 742 F.2d at 275.

The second agreement was the subcontract between the general contractor and the subcontractor, pursuant to which the subcontractor was to install the parking lot. This subcontract incorporated by reference the general contract's obligations and responsibilities:

> Subcontractor hereby assumes the same obligations and responsibilities with re-

spect to his performance under this Subcontract, that Contractor assumes towards Owner with respect to his performance on the General Contract. If the General Contract, which is hereby incorporated by reference, fails or conflicts with any provision of this Subcontract, or any modification hereof, this Subcontract shall govern.

*Id.*

The third agreement was the performance bond that an insurance company as surety to the subcontractor issued in favor of the general contractor. The performance bond referred to the general contract, was conditioned on the subcontractor's performance under the subcontract, indemnified the general contractor for losses sustained due to the subcontractor's failure to perform, and incorporated the subcontract:

> KNOW ALL MEN BY THESE PRESENTS, That [the subcontractor], as principal and [the insurance company] as Surety, are ... bound unto [the general contractor], in the sum of ... ($108,000) Dollars ..., jointly and severally, firmly by these presents.
>
> WHEREAS, [the general contractor] has been awarded [the General Contract] by [the owner-developer] for [the shopping center], and;
>
> WHEREAS, the principal has entered into a written Subcontract with [the general contractor] to perform ... certain portions of the work in connection with said [General Contract], consisting of ... as stated in Subcontract No. 4234–06 ... which Subcontract is hereby referred to and made a part hereof.

*Id.* at 276.

When a dispute arose over the subcontractor's performance, the general contractor made a claim under the performance bond against the surety and sought to arbitrate the claim. The surety resisted and sought an injunction precluding the arbitration. The district court, however, compelled arbitration, and the Court of Appeals for the Sixth Circuit affirmed the district court on appeal. The court of appeals held that even though the performance bond did not contain an arbitration clause, a court nevertheless could compel the surety to arbitrate by reason of the arbitration clause contained in the general contract because the performance bond specifically incorporated by reference the terms of the subcontract, and the subcontract in turn incorporated the general contract's obligations, including the general contract's duty to arbitrate. *Id.* at 276–77. The court of appeals explained that "a party does not have to be a signatory to the contract [containing the arbitration clause] when the contract is specifically incorporated by reference in the surety bond." *Id.* at 276.

Finally, in *Gilbane Building* the Court of Appeals for the First Circuit also compelled arbitration based on an incorporated arbitration clause. In that case, a surety sought to compel arbitration of a dispute over one of several separate but related construction projects. The particular dispute that the surety sought to arbitrate involved three agreements structured in a column similar to those in *West Point Construction* and *Haskell:* a prime contract, a subcontract, and a performance bond.

The prime contract between the general contractor and the project's owner contained an arbitration clause stating that "[a]ll claims, disputes and other matters in question arising out of, or relating to this Agreement or the breach thereof, ... shall be decided by arbitration ... unless the parties mutually agree otherwise." *Gilbane Bldg.*, 992 F.2d at 388. The subcontract between the general contractor and a structural-steel subcontractor incorporated the terms of the prime contract:

[The general contractor] shall be bound to [the subcontractor] by the terms of this agreement, to the extent that the provisions of the contract documents between the owner and [the general contractor] apply to the work of [the subcontractor] as defined in this agreement[.] [The general contractor] shall assume toward [the subcontractor] all the obligations and responsibilities that the owner, by those documents, assumes toward [the general contractor]. [The general contractor] shall have the benefit of all rights, remedies, and redress against [the subcontractor] which the owner, by those documents, has against [the general contractor].

*Id.* The subcontract defined "the contract documents" as the prime contract, the conditions of that contract, and several other related conditions. *Id.* at 388 n. 2. The performance bond incorporated the subcontract by reference: "Whereas, [the subcontractor] has by written agreement ... entered into a Subcontract with [the general contractor] ... which Subcontract is by reference made a part hereof." *Id.* at 388.

After the subcontractor ceased operations and defaulted on its subcontracts, litigation ensued in which the surety sought to compel arbitration of claims pursuant to the arbitration clause contained in the prime contract. Though the surety was not a signatory to the prime contract, it relied on the incorporation-by-reference theory to justify its action in seeking arbitration. Citing *Haskell*, the court of appeals agreed with the surety and upheld the district court's order compelling arbitration. *Id.* at 388–89. Because the subcontract incorporated the prime contract's obligations—with the general contractor assuming towards the subcontractor all obligations that the owner had assumed towards the general contractor under the prime contract, and the subcontractor like-wise assuming towards the general contractor all obligations that the general contractor had assumed towards the owner under the prime contract—including the obligation to arbitrate disputes arising from the contract, the court of appeals held that the subcontract obligated the general contractor to arbitrate disputes with the subcontractor arising from the subcontract. *Id.* And because the performance bond had referred explicitly to the terms of the subcontract, the contractor was bound to arbitrate its claim against the surety under the performance bond as well. *Id.*

### e. Declining to Incorporate Restrictively Worded Arbitration Clauses That Refer to the Immediate Parties

The foregoing opinions of three courts of appeals are in harmony with the principle that a general incorporation clause effectively can incorporate an arbitration agreement. Nevertheless, Century argues that these cases are of limited use in this case because in its view when an arbitration agreement between one set of parties is incorporated by reference into another agreement involving parties not bound by the original agreement, a determination whether the parties to the second agreement are bound to arbitrate depends on the original arbitration agreement's narrowness or breadth. Focusing on whether an arbitration clause's language is "narrow" or "broad," Century asserts that "the widely accepted rule is that arbitration clauses that reference the specific parties to which they apply—even if incorporated by reference—are narrow clauses that do not support arbitration of disputes beyond those between the specific parties identified in the clause." Appellant's opening br. at 29. In support, Century cites to *Import Export Steel Corp. v. Mississippi*

*Valley Barge Line Co.*, 351 F.2d 503, 506 (2d Cir.1965), and *Progressive Casualty*, 991 F.2d at 45.

*Import Export Steel* involved maritime law, steel, and the high seas but nonetheless resembles this reinsurance and retrocession case because its result turned on an interrelated set of contracts. There, a steel company signed a subcharter agreement with a ship's disponent owner to transport steel coils from Germany to Louisiana.[19] This subcharter agreement, later amended, between the charterer-steel company and the disponent owner contained an arbitration clause that applied to "any dispute ... between the Owners and the Charterers." *Imp. Exp. Steel*, 351 F.2d at 504–05. Later, a third party and the disponent owner executed an agreement under which the third party assumed the disponent owner's obligations and privileges under the subcharter agreement, and, in exchange, the disponent owner agreed to issue certain bills of lading.[20] These bills of lading were issued and designated the charterer-steel company as the holder of each bill, the disponent owner as the shipper, and the charterer-steel company's affiliate as the notify party, i.e., the party to receive notice of delivery. The bills of lading also incorporated by reference the subcharter agreement. *Id.*

The ship foundered before delivery, and both the charterer-steel company and its affiliate sought to invoke the subcharter agreement's arbitration clause against the third party to compel arbitration of liability for the lost cargo. *Id.* The Court of Appeals for the Second Circuit ruled that the charterer-steel company could enforce the arbitration clause against the third party because the third party had assumed the disponent owner's obligations and privileges under the subcharter agreement, to which the charterer-steel company was a party, and also because the charterer-steel company held the bills of lading that had incorporated by reference the arbitration clause. *Id.* at 506 (explaining that holder of bill of lading specifically referring to charter agreement and incorporating charter agreement's arbitration provision can compel party to charter agreement to arbitrate dispute within provision's scope).

The court of appeals, however, refused to permit the charterer-steel company's affiliate to compel arbitration because the affiliate was neither a party to the subcharter agreement nor a holder, shipper, or cosignee under the bills of lading. *Id.* at 505 (stating that nonparty claimant that is not holder, shipper, or cosignee of bill of lading cannot use charter agreement's arbitration provision, even if agreement's terms are incorporated into bill of lading). In addition, the court of appeals stated

**19.** A "disponent owner" is the party who originally charters the ship. A "charter agreement" is a contract by which a ship's owner leases all or a principal part of the ship, often to a merchant, for conveying goods on a predetermined voyage ("voyage charter") or for a predetermined period of time ("time charter"). *See* Black's Law Dictionary at 267. In *Import Export Steel*, there was a prior charter agreement between the ship's actual owner and the disponent owner. 351 F.2d at 504–05.

**20.** The Court of Appeals for the Fifth Circuit has explained:

A bill of lading is, in the first instance and most simply, an acknowledgment by a carrier that it has received goods for shipment. Secondly, the bill is a contract of carriage. Thirdly, if the bill is negotiated ... it controls possession of the goods and is one of the indispensable documents in financing the movement of commodities and merchandise throughout the world.
*Cargill Ferrous Int'l v. Sea Phoenix MV*, 325 F.3d 695, 702 (5th Cir.2003) (internal citation omitted).

that the terms of a bill of lading "should be carefully if not restrictively construed" because a bill of lading is the only document regulating the relations of the bill's transferees and owner. *Id.* at 505–06. With this consideration in mind, and noting that the arbitration clause "was restrictive in scope in that it is limited to disputes 'between the Disponent Owners and the Charters,'" the court of appeals concluded that "[i]t would be unduly stretching the language of this arbitration clause to say that [the affiliate], a mere notify party . . . is one of the 'Disponent Owners' or 'Charterers'" to which the clause applied. *Id.*

Almost 30 years later, the same court of appeals distinguished *Import Export Steel* in *Progressive Casualty*. In *Progressive Casualty*, a group of insurance companies insured an oil company and then obtained reinsurance of that coverage from a Venezuelan reinsurance company, RNV, which, in turn, reached corresponding annual retrocessional agreements with various retrocessionaires. 991 F.2d at 44. One retrocessional agreement contained a provision stating that it was "[s]ubject to" the underlying reinsurance contract. *Id.* at 45. The reinsurance contract, in turn, included an arbitration clause providing that "[a]ny question or dispute arising between the contracting parties concerning the interpretation of this Reinsurance Agreement . . . shall be settled by arbitration." *Id.* When a dispute arose, the reinsurance company sought to compel its retrocessionaires to arbitrate the dispute under the retrocessional agreement by arguing that the retrocessional agreement through its "subject to" clause incorporated the reinsurance agreement's arbitration clause. *Id.* at 45–46.

Applying New York law, the court of appeals held that the retrocessional agreement contained a valid agreement to arbitrate between the reinsurer and the retrocessionaire because it effectively incorporated the reinsurance agreement's arbitration clause and the clause itself was not worded so restrictively that it did not bind the retrocessionaires. *Id.* at 45–48. Distinguishing *Import Export Steel,* the court explained that while it previously had held that "an arbitration agreement restricted to the immediate parties does not bind a non-party, notwithstanding words of incorporation or reference in a separate contract by which that non-party is bound," it also had held that "a broadly-worded arbitration clause which is not restricted to the immediate parties may be effectively incorporated by reference into another agreement." *Id.* at 47–48. The court concluded that the arbitration clause in question, which called for arbitration of disputes "between the contracting parties" without specifying by proper name the identity of those parties, was worded broadly enough to allow its effective incorporation into other contracts:

> Unlike the clause in *Import Export,* the [reinsurance agreement's arbitration clause] is not restrictively worded by referring to the immediate parties to that contract by name. Rather, the [reinsurance agreement] merely provides for arbitration of disputes between 'the contracting parties.' We do not think it would be 'unduly stretching' the language of the clause to term the American Reinsurers and RNV 'contracting parties.'

*Id.* at 48 (internal citation omitted).

Century argues that we should adopt the principle of *Progressive Casualty* and base our decision on whether the arbitration provision is restrictively or broadly worded. Inasmuch as the reinsurance treaties' arbitration clause provides for ar-

bitration of disputes "between the Company [Argonaut] and INA [Century]," Century contends that the retrocessional agreements, in incorporating that clause, cannot include an agreement to arbitrate disputes between Century and Lloyd's.

Century supports its argument with *World Rentals & Sales, LLC v. Volvo Construction Equipment Rents, Inc.*, 517 F.3d 1240 (11th Cir.2008), a case in which the Court of Appeals for the Eleventh Circuit addressed two separate sets of agreements, one containing an arbitration clause and the other incorporating it, related to franchising the sale and leasing of construction equipment. In the first set, World Rentals, the franchisee, entered into franchise agreements with Volvo Rents, the franchisor, to sell and lease construction equipment. These franchise agreements each contained an arbitration provision stating that "all disputes ... arising between Franchisee and Franchisor shall be finally resolved by arbitration." *Id.* at 1242. The franchise agreements also defined "Franchisor" as referring only to Volvo Rents and specifically "not [to Volvo Rents'] corporate parents or affiliates." *Id.* at 1242–32.

In the second set of agreements, World Rentals contracted with Volvo Finance, an affiliate of Volvo Rents, for loans related to World Rentals' franchise operations. These loan agreements contained an incorporation provision stating that "[a]ll schedules, exhibits, and other documents ... referred [to] in this Agreement ... are hereby incorporated in this Agreement by reference in their entirety as if fully restated in this Agreement." *Id.* at 1243. Elsewhere, the loan agreements referred to the franchise agreements in defining

World Rentals' failure to make payments under the loan agreements and its default on the franchise agreements between World Rentals and Volvo Rents as events of default under the loan agreements.

After its business failed and World Rentals defaulted on the loan agreements, it brought tort and contract claims against both Volvo Rents and Volvo Finance in a district court, and eventually moved to compel both Volvo units to arbitrate. The district court denied World Rental's motion as to Volvo Finance. On appeal, addressing World Rentals' argument that Volvo Finance could be compelled to arbitrate because the World Rentals–Volvo Finance loan agreements incorporated by reference the franchise agreements and thus their arbitration clause, the court of appeals considered two questions: first, was the arbitration clause incorporated? And second, did the dispute fall within the terms of that arbitration clause? Regarding the first question, the court concluded that the loan agreements between World Rentals and Volvo Finance unambiguously incorporated the franchise agreements, including those agreements' arbitration clauses. *Id.* at 1245 ("[A]n arbitration clause can be incorporated even if the relevant incorporation language does not specifically refer to it.") (citing *J.S. & H. Constr. Co. v. Richmond County Hosp. Auth.*, 473 F.2d 212, 215 (5th Cir.1973)).

As for the second question, however, the court of appeals held that the dispute fell outside the scope of the arbitration clause.[21] *Id.* at 1246. Noting the proposition in *Progressive Casualty* that "an arbitration agreement restricted to the immediate parties does not bind a non-party, notwithstanding words of incorporation or

---

21. The court of appeals considered the issue whether Volvo Finance and World Rents had agreed to arbitrate disputes arising from the loan agreements as part of the "scope" ques-

tion, rather than as part of the initial "existence" question. *See also Kirleis*, 560 F.3d at 160 (citing *Trippe*, 401 F.3d at 532).

reference in a separate contract by which that non-party is bound," the court of appeals explained that while there is a liberal policy favoring arbitration agreements, "[t]here is no federal policy favoring arbitration of disputes that the parties have unambiguously excluded from their arbitration agreements." *Id.* at 1247 (citing *Progressive Cas.*, 991 F.2d at 47, and *Volt Info. Scis.*, 489 U.S. at 479, 109 S.Ct. at 1256). In *World Rentals*, the arbitration clause that was incorporated into the loan agreements between World Rentals and Volvo Finance unambiguously limited its application to disputes between the franchisee, defined as World Rentals, and the franchisor, defined as Volvo Rents, and expressly excluded any disputes between World Rentals and Volvo affiliates such as Volvo Finance. *Id.* In these circumstances, the court of appeals concluded that Volvo Finance could not be compelled to arbitrate its dispute with World Rentals because an order compelling it to do so would "not only 'unduly stretch,' but completely rewrite the arbitration clause, and compel a nonparty to arbitrate in the absence of ever having agreed to do so in the first place." *Id.* (quoting *Imp. Exp. Steel*, 351 F.2d at 506).

Century offers *World Rentals* in support of its claim that restrictively phrased arbitration clauses cannot be incorporated effectively through general incorporation-by-reference clauses. But the cases we just discussed do not reveal a widely observed, bright line rule. As the court of appeals in *World Rentals* noted, an arbitration agreement limited to the immediate parties effectively may be incorporated by reference, despite its restrictive phrasing, through different or additional incorporation language. *Id.* at 1247 n. 6 (citing *J.S. & H. Constr.*, 473 F.2d at 214 n. 3). And the reluctance to incorporate restrictively phrased arbitration clauses that refer to the immediate parties did not

preclude the court in *Haskell* from recognizing that there was such an incorporation. *See Haskell*, 742 F.2d at 275–76 (finding that arbitration clause providing for arbitration of disputes "which cannot be settled by negotiation between the Contractor and the Owner" effectively incorporated by reference into subcontract, and then to performance bond).

To support its claim that a "narrowly drafted" arbitration clause incorporated by reference into a separate contract, without more, cannot serve to bind parties not specified in the original clause, Century also cites to *Rice Co. v. Precious Flowers Ltd.*, 523 F.3d 528 (5th Cir.2008), claiming that in *Precious Flowers* the Court of Appeals for the Fifth Circuit applied Century's proposed rule. A question in *Precious Flowers*, an international-shipping case reminiscent of *Import Export Steel*, was whether the shipper, by relying on theories of agency and incorporation by reference, could compel the vessel owner to arbitrate a dispute over liability under a bill of lading, even though the vessel owner was not a signatory to an agreement containing an arbitration provision with the shipper.

*Precious Flowers* involved three interrelated contracts among a vessel owner, Precious Flowers; a time-charterer and disponent owner, IBN; and a shipper and voyage-charterer, the Rice Company. The first agreement was a time-charter agreement between vessel owner Precious Flowers and IBN, pursuant to which IBN obtained the vessel and became its disponent owner for a period of time. *Id.* at 532. This time-charter agreement between Precious Flowers and IBN contained an arbitration clause requiring that "all disputes arising out of this contract shall be arbitrated at London and ... governed by English law." *Id.* at 532 n. 6. It also provided that the time-charterer, IBN,

could act on behalf of Precious Flowers by signing bills of lading, albeit only "without prejudice to [Precious Flowers]." *Id.* at 532.

The second agreement was a voyage-charter agreement between IBN and the Rice Company, the shipper, pursuant to which the Rice Company would ship its cargo of rice on the vessel from the United States to Togo. *Id.* at 532–33. The voyage-charter agreement between IBN and Rice Company contained an arbitration clause providing that "any dispute ... between Owners and Charterers ... shall be referred to [arbitration]." *Id.* at 533. The court of appeals determined that the voyage-charter agreement defined the term "Owner" as the time-charterer and disponent owner, IBN, and defined the term "Charterers" as the voyage-charterer Rice Company. *Id.* at 532–35. It also determined that Precious Flowers was not a party to this agreement. *Id.*

The third agreement was a bill of lading that would have been issued by IBN and held by the Rice Company.[22] *Id.* at 533. This agreement, assuming it was signed, provided that "[a]ll terms and conditions [of the voyage-charter agreement], including the law and Arbitration Clause, are herewith incorporated." *Id.*

After rough seas related to Hurricane Rita damaged the rice on board, allegedly due to unseaworthy hatch covers, the Rice Company filed suit against the vessel itself, Precious Flowers, and IBN, and moved to compel arbitration. *Id.* at 531. There was no dispute that the bill of lading incorporated the voyage-charter agreement. The court of appeals first addressed whether the voyage-charter agreement bound Precious Flowers by its own terms, noting that the court recognized the distinction between "broad" arbitration provisions, such as those not restricted to particular parties or types of disputes, and "narrow" ones, such as those restricted to disputes "between the Owners and Charterers." *Id.* at 536 (internal citation omitted); *cf. Rohm & Haas,* 522 F.3d at 331–32 (discussing broad-versus-narrow distinction with respect to scope of arbitration agreement).[23] But the court of appeals emphasized that it did not follow this distinction between broad and narrow clauses mechanically. Even in the case of so-called broad arbitration clauses, if a particular dispute falls outside an arbitration clause's terms, whether worded broadly or narrowly, the parties cannot be compelled to arbitrate. *Precious Flowers,* 523 F.3d at 536; *accord, Rohm & Haas,* 522 F.3d at 332. The voyage-charter agreement's arbitration clause required arbitration only of disputes "between Owners [defined as IBN] and Charterers [defined as the Rice Company]"; as a matter of contractual construction, it was straightforward that Precious Flowers could not be compelled to arbitrate pursuant to the voyage-charter agreement because Precious Flowers was not party to the agreement and was not

---

**22.** The ship sailed early, and the bill of lading never was signed, but assuming it had been the case's result would not have changed. *Precious Flowers,* 523 F.3d at 535–36.

**23.** We note that Century quotes the Court of Appeals for the Fifth Circuit to assert that that court recognizes Century's broad-versus-narrow rule in the context of determining whether parties can be compelled to arbitrate. Appellant's reply br. at 21 (citing *Precious Flowers,* 523 F.3d at 536 ("[W]e do recognize the distinction between a broad and narrow arbitration clause.")). In so stating, however, the court of appeals relied on its caselaw addressing the question of an arbitration agreement's scope, not existence. *Precious Flowers,* 523 F.3d at 536 (citing *Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co. (Pemex),* 767 F.2d 1140, 1144–45 (5th Cir.1985) (no dispute as to existence of arbitration agreement)).

governed directly by the clause. *Precious Flowers*, 523 F.3d at 536.

The Rice Company nevertheless argued that Precious Flowers was bound to arbitrate the dispute pursuant to the bill of lading, based on a combination of theories of incorporation by reference and agency. The Rice Company argued that (1) in the time-charter agreement Precious Flowers had empowered IBN to ratify bills of lading as its agent, (2) IBN then had ratified the bill of lading, thus binding Precious Flowers, and (3) the ratified bill of lading incorporated the terms of the voyage-charter agreement, including its arbitration clause. *Id.* at 536.

The court of appeals rejected this argument because Precious Flowers had not empowered IBN to bind it. It explained that as a general matter, agency principles do not offend the FAA's fundamental rule that parties are not required to arbitrate when they have not agreed to do so. *Id.* at 538 ("[W]here an agent signs a contract requiring arbitration, the principal is bound by the arbitration requirement."). In *Precious Flowers*, however, the time-charter agreement between Precious Flowers and IBN expressly provided that even though IBN could ratify bills of lading, it could do so only "without prejudice" to Precious Flowers. Because Precious Flowers had limited the authority of IBN as its agent, allowing it to sign bills of lading only "without prejudice" to Precious Flowers, and because no other agreement applied against it, Precious Flowers was not bound to arbitrate the dispute with the Rice Company. *Id.* at 538–39.

In so concluding, the court of appeals distinguished *Cargill Ferrous International v. Sea Phoenix MV*, 325 F.3d 695 (5th Cir.2003), another admiralty case. In *Sea Phoenix*, three documents were implicated: (1) a time-charter agreement between the ship owner and the disponent owner, (2) a voyage-charter agreement between the disponent owner and the shipper containing an arbitration clause, and (3) a bill of lading that was ratified by the shipper and the vessel owner through its agent and that incorporated the voyage-charter agreement's arbitration clause. In these circumstances, the vessel owner could compel the shipper to arbitrate their dispute because the bills of lading between the vessel owner, through its agent, and the shipper incorporated the arbitration clause of the shipper's voyage-charter agreement with the disponent owner. *Id.* at 698–700.

In *Precious Flowers*, by contrast, the court of appeals rejected an attempt to bind a nonsignatory to an arbitration clause where it had not signed the arbitration agreement and where it had not authorized its agent to sign an arbitration agreement. It thus is true that the court ruled that the arbitration clause which named the specific parties to which it applied, did not bind the nonsignatory. But *Precious Flowers* depended on the application of principles of agency, not on a mechanical application of Century's proposed rule that an arbitration agreement restricted to the immediate parties does not bind a nonparty, notwithstanding words of incorporation or reference in a separate contract by which that nonparty is bound.

### f. Questions of Existence and of Scope

It seems clear that because Century predicated its argument on its contention that an incorporated arbitration clause's narrow or broad phrasing determines whether there is an arbitration agreement between the incorporating parties, it risks confusing its proposed rule with the narrow-versus-broad distinction relating to the separate question of an arbitration agreement's scope. *Local 827, Int'l Bhd. of Elec. Workers v. Verizon N.J., Inc.*, 458

F.3d 305, 310 (3d Cir.2006). In particular, Century cites to *Rohm & Haas,* 522 F.3d 324, 331–32, in asserting that we have refused to enforce arbitration agreements and have respected clauses' limitations where such clauses are "narrow." Appellant's opening br. at 35–36; Appellant's reply br. at 22.

In *Rohm & Haas,* a labor-dispute case, we addressed whether certain employees who disputed denials of their disability claims under an employee-benefits plan could compel the company and the plan administrator to submit the dispute to arbitration pursuant to a separate collective-bargaining agreement's grievance procedure. The first agreement, effective 2000–2004, was the collective-bargaining agreement between the company and the union covering a particular facility (the "CBA"). The CBA applied "only to the wages, hours, and working conditions of the . . . employees" and created a dispute-settlement procedure for disputes "involv[ing] wages . . . , hours . . . , and working conditions." *Id.* at 327–28. According to this procedure, if other means fail, "either party [the union or the company] may submit the matter to arbitration as described" in another CBA provision. *Id.* at 328.

The second agreement, effective beginning in 2003, was the employee-benefits plan. This plan provided certain benefits to both union and non-union employees working at various facilities, not merely the one covered by the CBA, and the plan, as is common under such plans, vested the sole discretion to interpret and apply the plan in an administrative committee. *Id.* at 329. Moreover, the plan provided a procedure for submitting claims, including a requirement for claimants denied benefits to be notified of their statutory rights to bring ERISA claims.[24] Unlike the CBA, the plan did not provide for arbitra-

tion of disputes. *Id.* at 329–30. The union was not a signatory to the benefits plan which, significantly, did not incorporate or otherwise refer to the CBA. *Id.* at 329. Addressing whether the CBA's arbitration clause should be deemed narrow or broad, we concluded that the clause was broad because it did not expressly exclude categories of grievances, such as issues concerning disability benefits, from arbitration. *Id.* at 332. But we emphasized that, regardless of whether an arbitration clause is labeled as broad or narrow, the central questions with respect to its application remain whether the parties agreed to submit disputes to arbitration and whether the particular dispute falls within the arbitration agreement's scope. *Id.*

There was no dispute that the CBA contained a valid agreement between the company and the union to arbitrate certain matters. Nevertheless, we concluded that the employees and their union could not compel arbitration of disputes arising from the benefits plan pursuant to the CBA's arbitration clause despite that clause's broad wording because the dispute over employee benefits was outside that clause's scope, which was limited to wages, hours, and working conditions, and because neither agreement referred to or incorporated the other: the CBA's mention of a sickness plan did not incorporate the benefits plan and the benefits plan did not provide that adverse determinations were subject to the CBA's grievance procedure. *Id.* at 332–36.

We based our decision in *Rohm & Haas* on the scope of a valid arbitration agreement. Accordingly, Century's attempt to apply the logic of *Rohm & Haas* to support its contention that the parties did not form a valid arbitration agreement is misplaced. Our decision in *Rohm & Haas*

24. *See* 29 U.S.C. § 1133.

does not confirm Century's proposed approach to the incorporation-by-reference question based on an incorporated arbitration clause's narrow-versus-broad or restrictive-versus-unrestrictive phrasing.

Similarly, Century cites *Chimicles*, 447 F.3d at 210–11 to support its contention that we should not apply the incorporation-by-reference clause in the retrocessional agreements to form an agreement between Century and Lloyd's to arbitrate. In essence, Century reads *Chimicles* to hold that a "narrow" arbitration clause when incorporated into another contract cannot apply to disputes under that contract, and thus, in its view, *Chimicles* supports our adoption of the rule in *Progressive Casualty*: the incorporation of an arbitration clause that specifies parties to which it applies does not bind parties to the distinct agreement containing the incorporation-by-reference clause.

In *Chimicles*, we considered whether two limited partners in a partnership in receivership could compel the partnership's receiver to arbitrate a dispute over the requirements of subscription agreements between the limited partners and the partnership. The limited partners based their argument on an arbitration clause contained in the partnership agreement between the limited partners and the general partner.

The partnership agreement was between an LLC as general partner and certain investors as private limited partners. The partnership agreement contained an arbitration clause stating that "[t]he General Partner and the Private Limited Partners ... hereby agree that any and all controversies ... arising out of ... this Agreement ... shall be settled by arbitration...." *Chimicles*, 447 F.3d at 210. The partnership agreement also included a choice-of-venue clause providing that an "[a]ction to enforce any provision of this Agreement or any action brought by the Partners against the General Partner or the Partnership shall be brought through arbitration in New Jersey, pursuant to [the arbitration clause]." *Id.* The partnership agreement indicated that it was a fully integrated contract. *Id.*

In the subscription agreements between each investor and the partnership, each investor agreed to make certain capital contributions to the partnership "in accordance with the terms and conditions described herein and in the Partnership Agreement." *Id.* at 210. In addition, each investor agreed "to be bound by all of the terms and conditions of the Partnership Agreement." *Id.* But neither subscription agreement contained an arbitration clause, and the subscription agreements indicated that they were fully integrated contracts. *Id.*

When the partnership's receiver sought to enforce the investors' contribution requirements under the subscription agreements, the investors moved to compel arbitration pursuant to the partnership agreement's arbitration clause. We rejected this effort on several grounds. We explained that the partnership itself was not bound directly by the partnership agreement because it was not a signatory to the agreement. Even assuming that the subscription agreements incorporated by reference the partnership agreement's arbitration clause, they did so against the investors and not against the partnership itself. *Id.* at 209–10 (subscription agreements providing that investors agree "to be bound by all terms and conditions of the Partnership Agreement"). And even if a court were to read the incorporation-by-reference clause as binding against the partnership, the arbitration clause was intended to apply to suits that the limited partners brought, not to those that the partnership brought. *Id.* at 210–11. Fi-

nally, even if the partnership somehow were bound to arbitrate, we noted a provision in the partnership agreement that would have negated that obligation in the circumstances of the case. *Id.* In what did not seem to be a close case, we concluded that the partnership had not formed an arbitration agreement with the investors, so it could not be compelled to arbitrate.

Century focuses on our statement in *Chimicles* that "[e]ven assuming *arguendo* that [the incorporation clause of] the subscription agreement incorporates by reference the terms and conditions of the partnership agreement, the arbitration provision does not apply to an action brought by [the partnership or its receiver]." *Id.* at 210; Appellant's opening br. at 38–39. Century argues that this statement "directs that the narrow arbitration clause in the [reinsurance treaties] be interpreted according to its own terms, even if incorporated into the [retrocessional agreements]." Appellant's reply br. at 26. But in concluding that the arbitration provision did not apply to actions brought by the partnership, even if incorporated, we also relied on the incorporation clause itself, which incorporated the terms and conditions of the partnership agreement only against the limited partners. *Chimicles,* 447 F.3d at 210. Considering the multiple bases for our conclusion that there was not an agreement to arbitrate, *Chimicles* does not bear the weight that Century would put on it.

### g. *John F. Harkins Co.*

Lloyd's asserts that we have rejected the rule proposed by Century in *John F. Harkins Co. v. Waldinger Corp.,* 796 F.2d 657 (3d Cir.1986). In *John F. Harkins,* a construction case involving a dispute between a primary contractor and a subcontractor, the question was whether the primary contractor and subcontractor intended the terms of the principal contract between the project manager and primary contractor, including the principal contract's restrictive arbitration clause, to govern the terms of the subcontract between the primary contractor and the subcontractor, where the subcontract included a broader arbitration clause but incorporated the general contract's obligations.

The principal contract between the project manager and the primary contractor addressed arbitration of disputes, providing for arbitration only of those disputes named in the contract as arbitrable: "[i]n any case in which it is provided by the terms of this contract that any specific dispute or specific payment to be made shall be determined by arbitration, such arbitration shall be conducted [in a certain manner]." *Id.* at 660–61. Elsewhere, the principal contract provided for arbitration only of disputes over written change orders: "[i]n case of disagreement as to the amount to be paid or allowed [under a written change order], the Contractor shall promptly comply with the order and the amount shall be determined by arbitration as herein provided." *Id.* at 661.

In contrast to the principal contract, the subcontract between the primary contractor and the subcontractor contained a broadly worded arbitration clause providing that "[a]ll disputes ... arising hereunder shall be subject to arbitration...." *Id.* at 660. The subcontract also included a section referring to the principal contract. This section provided that the subcontractor's work and materials used "shall be in strict accordance with the [principal] CONTRACT DOCUMENTS." *Id.* It also provided that "SUBCONTRACTOR shall be bound by all provisions of these documents and also by the applicable provisions of the PRINCIPAL CONTRACT to which the

CONTRACTOR is bound, and to the same extent. . . ." *Id.*

Reviewing for clear error, we upheld the district court's interpretation—which was based on the provisions' language and on extrinsic evidence that included an unopposed affidavit stating that the parties intended the subcontract's "shall be bound" section to limit the subcontractor's rights against the primary contractor to those of the primary contractor against the project manager—that the parties intended the subcontract to incorporate the principal contract's more restrictive arbitration clause. *Id.* at 659–62. Under this interpretation, we upheld the district court's decision that arbitration must be enjoined because the dispute did not fall within that clause's scope.

Lloyd's reads *John F. Harkins* as a basis for rejecting Century's distinction between the effects of incorporated arbitration clauses that specify the parties to whom they apply and those lacking such restrictions. Considering the case's standard of review and its facts, however, *John F. Harkins* does not support Lloyd's's interpretation. But neither does it compel a result based solely on an arbitration clause's specifying by name the parties to which it applies, because, as seen in *John F. Harkins,* a second agreement's incorporating language may affect the application of that clause to new parties. The result depends on the parties' intent.

### h. Incorporation by Reference for a Limited Purpose

In an argument related to its claim that restrictively worded arbitration clauses referring to the immediate parties, when incorporated into another agreement, generally cannot support arbitration of disputes between parties not identified in the clause, Century also argues that the parties may intend general incorporation

clauses to have a limited purpose. Here, Century contends that the parties intended the retrocessional agreements' incorporation language only to clarify the scope of Lloyd's's "substantive" obligations under the reinsurance treaties—that is, its liability—and not to incorporate other obligations that Century characterizes as "procedural," such as the agreement to arbitrate. In illustration, Century cites *AgGrow Oils,* 242 F.3d at 779.

In *AgGrow Oils,* a surety case, the Court of Appeals for the Eighth Circuit considered a dispute between the owner of a processing facility and the surety to a contractor hired by the owner to build the facility. AgGrow Oils, the plant owner, entered into a construction contract with a construction company for it to build the processing facility. The construction contract contained an arbitration clause stating that "any controversy or Claim arising out of or related to the Contract, or the breach thereof, shall be settled by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association." *Id.* at 780 n. 1. The construction company guaranteed that the completed facility would reach a certain level of performance. *Id.* at 779. The construction contract also stated that it should "not be construed to create a contractual relationship of any kind . . . between any persons or entities other than [the plant owner and the construction company]." *Id.* at 781.

In related contractual dealings, the construction company purchased processing equipment from a manufacturer and obtained engineering services from the construction company's own subsidiary. In addition, the construction company's surety issued a performance bond to the plant owner guaranteeing the construction company's performance by binding the surety "to the [Plant] Owner for the performance

of [the construction company's obligations under] the Construction Contract, which is incorporated herein by reference." *Id.* at 779.

After construction was completed, the facility failed to meet the construction company's performance guarantees, and a variety of disputes ensued that later were consolidated into a single action. The surety then moved to stay the plant owner's suit and to compel the plant owner to arbitrate its claim against the surety under the performance bond, based on the construction contract's arbitration clause that the surety claimed was incorporated into the bond.

Applying North Dakota law, the court of appeals held that the incorporation clause was ambiguous on the issue of arbitrability. *Id.* at 781. The court found that the incorporation clause's main purpose was to clarify the construction company's performance obligations that the construction company's surety undertook to guarantee. But the court found that the clause did not clearly reflect the owner's and the surety's intent to provide for arbitration of their disputes under the bond, particularly in light of the performance bond's provision referring to judicial settlement of disputes and the construction contract's provision stating that the contract not create contractual relations between any other parties. *Id.* The court further considered the purpose of surety bonds generally: to provide recourse to an obligee against a secondary obligor in the event of the principal obligor's failure to perform the underlying obligation. *Id.*

The court acknowledged that there were several decisions concluding that performance bonds incorporating the terms of underlying contracts also incorporated those contracts' arbitration agreements. *Id.* at 781–82. Nevertheless, the court concluded that, in the circumstances it confronted,

the owner and the surety had not reached an agreement to arbitrate disputes under the performance bond because the purpose of the bond's incorporation clause was to define the scope of the surety's liability, not to apply the entirety of the construction contract to the bond:

> Mindful of the fundamental principle that arbitration under the [Federal Arbitration] Act is a matter of consent, not coercion, we are unwilling to construe an incorporation clause whose obvious purpose was to clarify the extent of the surety's secondary obligation as also reflecting a mutual intent to compel arbitration of all disputes between the surety and the obligee under the bond.... [W]e conclude there was no such agreement to arbitrate.

*Id.* at 782 (internal citation and quotation marks omitted) (first alteration in original).

■ Thus, even if an incorporated arbitration clause is not restricted to the immediate parties in the original agreement, courts may refuse to compel arbitration where the parties do not intend to incorporate the agreement to arbitrate. Century cites this decision to show that parties may incorporate a separate contract into their agreement for certain purposes and not others, and argues that the parties intended here for the retrocessional agreements to incorporate the reinsurance treaties only to clarify the extent of the obligations that Lloyd's assumed under the retrocessional agreements.

### i. The Retrocessional Agreements

#### *(1) The Agreement's Language and Structure*

With the cases we have discussed in mind, we turn to the agreements at issue in this case. The three reinsurance treaties between Century and Argonaut large-

ly contain identical language and, so far as germane here, do not differ materially. Article 15 of each treaty contains an arbitration clause under which Century and the Company, defined previously as Argonaut, agree to submit disputes to arbitration:

> If any dispute shall arise between the Company [Argonaut] and INA [Century] with reference to the interpretation of this Agreement or their rights with respect to any transaction involved, the dispute shall be referred to three arbitrators, one to be chosen by each party and the third by the two so chosen.... The arbitrators shall consider this Agreement an honorable engagement rather than merely a legal obligation; they are relieved of all judicial formalities and may abstain from following the strict rules of law. The decision of a majority of the arbitrators shall be final and binding on both the Company [Argonaut] and INA [Century]. The expense of the arbitration and arbitrators shall be equally divided between the Company [Argonaut] and INA [Century]. Any such arbitration shall take place in San Francisco, California, unless some other location is mutually agreed upon by the Company [Argonaut] and INA [Century].

App. at 59–60, 101, 127 (bracketed material added). Notably, this arbitration provision specifies the parties to whom it applies. Cf. *Progressive Cas.*, 991 F.2d at 47–48 (holding that arbitration provision referring only to "contracting parties" was "worded broadly enough to allow its incorporation by reference into other contracts").

We next turn to the three corresponding retrocessional agreements between Century and Lloyd's, each containing essentially the same terms. Under the retrocessional agreements' Paragraph 1, Century ceded to Lloyd's 90% of the premiums and losses resulting from Century's reinsurance treaties with Argonaut: Century would pay Lloyd's 90% of the premiums it received from Argonaut, and, in exchange, Lloyd's would pay Century 90% of the losses that Century paid to Argonaut under the reinsurance treaties.[25] Paragraph 1 of each retrocessional agreement also refers to and incorporates the corresponding reinsurance treaty in stating that a copy of the treaty is attached and "made a part hereof." App. at 30, 71, 109 (Para.1).

Paragraph 2 of the retrocessional agreements provides:

> Subject to the percentage allocation in the preceding paragraph, all terms and provisions of the [reinsurance treaty] shall be applied to this agreement as if contained herein, and [Lloyd's] shall receive prompt notice of any change in the Policy. Material changes are not binding on [Lloyd's] unless agreed.

App. at 30, 71, 109 (Para.2). Thus, immediately after Paragraph 1 incorporates the corresponding reinsurance treaties, Paragraph 2 "applie[s]" them.

### (2) Construing the Agreement

As we already have indicated, neither party claims that the provisions of the retrocessional agreements are ambiguous

---

25. Paragraph 1 of the retrocessional agreements states in part:

[Century] agrees to cede and [Lloyd's] agrees to accept 90% (ninety percent) of the liability which accrues to [Century] under its Reinsurance Agreement ... issued to [Argonaut]. [Century] shall pay to [Lloyd's] 90% (ninety percent) of all premiums paid to [Century] under the policy, and [Lloyd's] shall pay to [Century] 90% (ninety percent) of the losses and loss adjustment expenses paid by [Century] thereunder.

App. at 30, 71, 109 (Para.1).

with respect to the first fundamental question on this appeal, whether the parties entered into a valid arbitration agreement establishing a mechanism for resolution of the dispute in this case. Thus, we will seek to give effect to the parties' agreements and thus their obligation *vel non* to arbitrate disputes solely by making reference to the documents themselves, taking the entire contracts into consideration and assuming that the sophisticated parties to the agreements chose their language, particularly that of the incorporating provisions, carefully. *See Murphy*, 777 A.2d at 429–30. Our approach recognizes that this case involves contractual construction and that we are exercising plenary review rather than applying the clearly erroneous standard applicable in contract interpretation cases.[26] *See, e.g., John F. Harkins*, 796 F.2d at 659–60. We are dealing with retrocessional agreements designed to shift risk, defined through reference to the underlying reinsurance treaties, from Century to Lloyd's. In this regard, Paragraph 1, it seems clear, is intended to define the scope of Lloyd's's derivative liability. *See AgGrow Oils*, 242 F.3d at 781–82 (noting that purpose of incorporation by reference was to define surety's secondary liability). Paragraph 1 identifies the reinsurance treaty that Lloyd's will insure, attaches and incorporates that document by reference, and specifies the percentage of that treaty's liabilities and premiums that Lloyd's will assume. App. at 30, 71, 109

(retrocessional agreement para. 1) (emphasis added).

Paragraph 2 again refers to the reinsurance treaties, but it does so in markedly different language. It "applie[s]" all terms and provisions of the incorporated reinsurance treaty to the retrocessional agreement:

> Subject to the percentage allocation in the preceding paragraph, *all terms and provisions of the Policy shall be applied to this agreement as if contained herein*, and [Lloyd's] shall receive prompt notice of any change in the Policy. Material changes are not binding on [Lloyd's] unless agreed.

*Id.* (para. 2) (emphasis added). Considering Paragraph 1 and 2 together, *see Murphy*, 777 A.2d at 429–30, if Paragraph 2's incorporation provision only clarified the extent of Lloyd's's derivative liability—something that Paragraph 1 just accomplished—then Paragraph 2 would be superfluous. Rather, Paragraph 2's incorporating language, in differing from Paragraph 1's, suggests a different purpose. The incorporation applies "all" terms of the pertinent reinsurance treaty.

Indeed, this reiterative incorporation clause is phrased more strongly and expansively than those in many of the cases that the parties cite, including those in which the provision was held to incorporate the arbitration clause. *See, e.g., Pro-*

---

26. We cannot prejudice Century by our exercise of plenary review because application of that standard of review only can enhance the possibility of an appellant obtaining a reversal on an appeal. Of course, if we attempted to ascertain the parties' intent with respect to the specific issues involved here, we would be engaging in a process equivalent to writing a work of fiction because we do not find in the record any reason to believe that when the parties were negotiating the retrocessional agreements they intended to deal with the precise questions involved in this case. Accordingly, though the parties surely intended to be bound by the retrocessional agreements, including the incorporation-by-reference clause, it would be difficult to decide this case on a meeting-of-the-minds determination similar to our process in *Par–Knit Mills*. Indeed, we have no doubt that if the parties had foreseen the dispute involved here, they would have dealt with it directly in the retrocessional agreements and thereby avoided incurring the significant cost and uncertain outcome of this litigation.

*gressive Cas.*, 991 F.2d at 45–46 (finding arbitration clause was effectively incorporated against nonsignatory solely through "subject to" language). Applying the retrocessional agreement to give effect to all its provisions as Pennsylvania law directs that we do, *Capek v. Devito*, 564 Pa. 267, 767 A.2d 1047, 1050 (2001), Paragraph 2 applies as to Lloyd's and Century the terms and provisions of the reinsurance treaties, precisely what Paragraph 2 says.

Century also asserts that Paragraph 2's introductory clause, "[s]ubject to the percentage allocation in the preceding paragraph," indicates that only certain obligations were incorporated because only "substantive" issues relating to liability can be subject to the percentage allocation of risk and premiums, while "administrative" provisions such as the arbitration clause cannot. But Paragraph 2's text does not easily admit such a reading; its incorporating language is inescapably broad. Thus, the more reasonable reading of Paragraph 2 is that the parties applied "all" of the reinsurance agreements' terms and provisions to the retrocessional agreement, except that Lloyd's's rights and obligations respecting premiums and losses are defined as stated in Paragraph 1 of the retrocessional agreements. The reinsurance treaties' arbitration provision does not conflict with Paragraph 1's allocation of liability and premiums, so the provision may be applied to the retrocessional agreements.

### (3) Language Absent from the Incorporation Clauses

We note as well certain language that the retrocessional agreements and the reinsurance treaties lack. Many cases denying motions to compel arbitration have involved contractual provisions that limited the applicability of the incorporated arbitration clause. In *Chimicles*, for example,

a partnership was not compelled to arbitrate pursuant to certain subscription agreements to which it was a signatory because the subscription agreements, which incorporated the terms of another agreement, including that agreement's arbitration clause, did so only as against the limited partners, not against the partnership itself. *Chimicles*, 447 F.3d at 209–10. And even if it had bound the partnership, the partnership agreement in that case also contained a provision specifically excluding from arbitration the exact circumstance in which the dispute in that case arose. *Id.* at 211.

Moreover, the retrocessional agreements do not limit the parties against which the reinsurance treaties' arbitration clauses are applied. *Cf. Chimicles*, 447 F.3d at 209–10 (partnership not bound by arbitration agreement where subscription agreements incorporated terms of partnership agreement, including its arbitration clause, only against limited partners and not against partnership itself). Nor is there a specifically applicable contractual exclusion. *Id.* at 211 (partnership agreement that purportedly incorporated arbitration clause also specifically excluded from arbitration exact circumstance under which dispute in that case arose).

Similarly, in *AgGrow Oils*, the construction contract, later incorporated into the subcontract, specifically provided that it "should not be construed to create a contractual relationship of any kind" other than that between the parties to that contract. 242 F.3d at 781. And in *World Rentals*, 517 F.3d at 1242–43, the underlying contract's arbitration clause specifically defined the parties bound to arbitrate and, in an unusual provision, explicitly excluded corporate parents or affiliates. *Cf. Precious Flowers*, 523 F.3d at 532–35 (finding that agency theory though applicable inadequate to bind vessel owner where under-

lying contract authorized agent to sign bills of lading only "without prejudice" to the vessel owner).[27] Century does not point to any such limiting language here.

### (4) Century's Problems

Century points to certain problems with Lloyd's's position that we should construe the retrocessional agreements to incorporate "all" of the reinsurance treaties' provisions, including their arbitration clause, as against Century and Lloyd's. First, applying each and every provision of the reinsurance treaties to the retrocessional agreements results in some duplication, because the agreements and the treaties both contain provisions giving each party access to the other's books, designating John F. Sullivan Co. as intermediary, and providing for interim loss payments upon request.

In addition, Century asserts that applying "all" provisions produces absurd results. The reinsurance agreements' Article 8 refers to employer insurance. Century argues that it is preposterous to conclude that the parties intended through the incorporation clause to obligate Lloyd's on policies that Century issues directly to its own employees. Similarly, Century claims that it is absurd to construe the provisions covering lines of businesses through the incorporation clause to make Lloyd's liable on any policies Century directly issued. We note, however, that the effect of the parties' agreement on these provisions is not be-

fore us, and if it were the asserted absurdity possibly would be an argument against concluding that the parties incorporated these provisions against each other. On the other hand, it surely would not be absurd for the retrocessional agreements to incorporate the arbitration provisions of the reinsurance treaties.

Moreover, Century has a more pointed problem of its own. In view of its position here, it is significant that Century's position during arbitration suggested that the incorporating provisions had broad effect. In this regard, Century in its prehearing brief during the arbitration proceedings directed the panel to the reinsurance treaties' follow-the-fortunes clauses:

> It cannot be disputed that the contracts at issue contain the follow the fortunes and settlements provisions. The contracts state that: 'All loss settlements made by the Company [Argonaut], within the terms of this Agreement, shall be unconditionally binding upon INA [Century], and amounts falling to the share of INA [Century] shall be payable by them upon reasonable evidence of the amount paid[.]' (XOL Treaties, Exhibit '2', Article 10.)

App. at 231–32 (immaterial footnote omitted) (quoting reinsurance treaties). Century then argued that this provision in the reinsurance treaties applied to Lloyd's vis-à-vis Century under the retrocessional agreements:

> 992 F.2d at 388 (involving agreement stating "[general contractor] shall assume toward [subcontractor] all the obligations and responsibilities that the owner, by [the prime contract], assumes toward [general contractor]. [General contractor] shall have the benefit of all rights, remedies, and redress against [subcontractor] which the owner, by [the prime contract], has against [general contractor].").

---

27. We also note that the retrocessional agreements do not contain language indicating an assumption of the obligations of the other party to the underlying contracts. *See Haskell*, 742 F.2d at 275 ("Subcontractor hereby assumes the same obligations and responsibilities with respect to his performance under this Subcontract, that Contractor assumes towards Owner with respect to his performance on the General Contract."); *Gilbane Bldg.,*

That means that Underwriters [Lloyd's] are bound by Century's settlements with Argonaut and must pay Century when Underwriters [Lloyd's] are presented with 'reasonable evidence of the amount paid' by Century.

App. at 231–32 (immaterial footnote omitted). Consequently, Century's position is that at least some of the resinsurance agreements' provisions that were phrased restrictively by referring to the immediate parties were "applied" to the retrocessional agreements in a manner that involved transposing the parties' names—that is, provisions referring to Argonaut and Century can refer, through their incorporation into and then their "application" within the retrocessional agreements, to Century and Lloyd's. Indeed, Century continues before us to maintain that the retrocessional agreements contain follow-the-fortunes clauses. Appellant's opening br. at 47.[28] Century's position regarding the follow-the-fortunes clauses thus strongly undercuts its position that the parties did not provide for the incorporated arbitration clause to apply vis-à-vis Century and Lloyd's to their disputes.

### (5) The Forum–Selection and Service–of–Suit Clause

■ Century also argues that the retrocessional agreements' service-of-suit clause indicates that disputes between the parties should be resolved exclusively in the courts. The provision in question states:

In the event of the failure of [Lloyd's] hereon to pay any amount claimed to be due hereunder, [Lloyd's] hereon, at the request of [Century], will submit to the jurisdiction of any Court of competent jurisdiction within the United States and

will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

App. at 32 (retrocessional agreement para. 12). Cf. AgGrow Oils, 242 F.3d at 780–81 (reading performance bond's clause providing for judicial settlement of disputes to indicate ambiguity as to intent to incorporate agreement to arbitrate); Collier Dev. Co. v. Jeffco Constr. Co., 25 Pa. D. & C. 4th 193, 196–99 (1995) (finding no intent to incorporate agreement to arbitrate where subcontract expressly provided different method for settlement of disputes). But service-of-suit clauses do not negate accompanying arbitration clauses; indeed, they may complement arbitration clauses by establishing a judicial forum in which a party may enforce arbitration. See Patten Secs. Corp. v. Diamond Greyhound & Genetics, Inc., 819 F.2d 400, 406–07 (3d Cir. 1987); Suter v. Munich Reins. Co., 223 F.3d 150, 155–56 (3d Cir.2000); Gaffer Ins. Co. v. Discover Reins. Co., 936 A.2d 1109, 1114–15 (2007) (contract's service-of-suit and consent-to-jurisdiction clause does not override contract's arbitration clause because, giving meaning to whole contract and to each provision if possible, provisions can coexist). Here, the service-of-suit clause does not indicate that the parties provided for the resolution of disputes only through litigation.

### (6) Imprecision in Incorporation by Reference

As our discussion of many cases demonstrates, the scope of incorporation-by-reference clauses in practice can lead to uncertainties when the clauses are translated from the underlying contract to the incor-

---

28. Of course, it hardly can do otherwise because in a sense the entire controversy in this case centers on Century's argument that Lloyd's was obligated to follow Century's fortunes when Century made its payments to Argonaut.

porating one. Take, for example, an arbitration clause in a contract between A and B stating that the clause applies to "the contracting parties" but not specifying the bound parties by name. Assume that this clause then is incorporated into another agreement between B and C. If the incorporated clause strictly preserved its original, literal meaning, "the contracting parties" would include only the parties to the original contract, i.e., A and B. But courts nevertheless have held that such clauses, when incorporated into subsequent contracts through general language of incorporation, may apply to the parties to the incorporating contract, i.e., B and C. *See, Progressive Cas.*, 991 F.2d at 44–46 (where arbitration clause provided for arbitration of disputes "between the contracting parties" in original agreement, incorporation-by-reference clause of subsequent agreement could bind signatories to subsequent agreement and thus require arbitration without unduly stretching arbitration clause's language). Parties employing such general incorporation language therefore require for the incorporation to be effective, and the courts perform, a certain level of transplantation or translation to resolve the imprecision inherent in general incorporation language.

This imprecision is at the heart of this case. Nevertheless, having considered the agreements at issue here in light of the cases and principles that we have discussed, and after recognizing that it surely is difficult, if not impossible, to reconcile all of these cases, we conclude that the most reasonable, probable, and natural construction of the incorporation-by-reference clause of the retrocessional agreements is to apply the clause to include the arbitration provision of the reinsurance treaties. The retrocessional agreements' general incorporation clause, the second of two clauses containing incorporation language, makes clear that the clauses incorporated "all" of the reinsurance treaties' terms and provisions so as to "appl[y]" them to the retrocessional agreements. By employing two incorporation provisions, including one that "applied" "all terms and provisions of the [indicated reinsurance treaty]," the parties bound themselves by the arbitration agreement. This agreement to be bound is all that Pennsylvania requires for them to be bound. Pennsylvania law does not require and under the FAA could not require an "express" and "unequivocal" statement specifically referring to the arbitration clause itself to incorporate that clause in another agreement. Despite what we acknowledge are certain strong arguments that Century advances in support of its contentions, applying general principles of Pennsylvania contract law we hold that the retrocessional agreements incorporated the arbitration clause of the reinsurance treaties and thus formed an agreement between Century and Lloyd's to arbitrate disputes.

### 4. Whether This Particular Dispute Falls Within the Scope of Century and Lloyd's Valid Agreement to Arbitrate

Having determined that there was a valid agreement to arbitrate between Century and Lloyd's, we turn to the second and we think easier aspect of the first fundamental issue in this case: whether the particular dispute in this case falls within the scope of that agreement. *See Kirleis*, 560 F.3d at 160. Regarding this question, "there is a presumption of arbitrability in the sense that [a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the dispute." *AT & T Techs.*, 475 U.S. at 650, 106 S.Ct. at 1419 (internal quotation marks and citations

omitted) (alteration in original). *See also Rohm & Haas*, 522 F.3d at 331 (citing *AT & T Techs.*). We have held, however, "that the presumption of arbitrability does not apply in all circumstances. Where the arbitration provision is narrowly crafted, we cannot presume, as we might if it were drafted broadly, that the parties here agreed to submit all disputes to arbitration." *Local 827, Int'l Bhd.*, 458 F.3d at 310 (internal citation and quotation marks omitted).

Century and Lloyd's dispute whether the retrocessional agreements obligated Lloyd's to reimburse Century for payments that Century made to Argonaut to cover expenses under the reinsurance treaties. The reinsurance treaties' arbitration clause, which we are holding that the retrocessional agreements incorporate as against Century and Lloyd's, provides for arbitration of "any dispute . . . with reference to the interpretation of this Agreement or [the parties'] rights with respect to any transaction involved." App. at 59–60, 101, 127. Rather than excluding various disputes from arbitration, this arbitration clause's scope is broad, and the presumption of arbitrability applies to it. And because this arbitration clause is undoubtedly susceptible of an interpretation that covers the dispute in this case, *see AT & T Techs.*, 475 U.S. at 650, 106 S.Ct. at 1419, we hold that the dispute between Century and Lloyd's over Lloyd's's obligation with respect to the declaratory judgment expenses falls within the scope of their arbitration agreement. Indeed, it seems clear that the arbitration provision was written to cover disputes exactly like the one between the parties here and we would reach our result with or without the presumption of arbitrability.

### 5. Whether The District Court Properly Compelled Arbitration

In sum, under general principles of Pennsylvania contract law, the retroces-sional agreements each incorporated and applied the pertinent reinsurance treaties' arbitration clauses. First, inasmuch as the terms of the unambiguous retrocessional agreements reflect that the parties incorporated the arbitration clauses to form agreements to arbitrate, the incorporation resulted in valid agreements between Century and Lloyd's to arbitrate certain disputes. Second, inasmuch as the arbitration agreements' scope included disputes arising from the retrocessional agreements, the dispute in this case over Lloyd's's obligations under the agreements falls within that scope. Accordingly, because there was a valid agreement to arbitrate between Century and Lloyd's and because the particular dispute here falls within the scope of valid arbitration agreements, we hold that the District Court properly compelled Century to submit the dispute to arbitration.

### B. Whether the Arbitration Award Should Be Vacated Because the Arbitrators Excluded Certain Evidence from Consideration

Having found that the District Court properly compelled arbitration, we consider the second fundamental question that Century raises on this appeal; whether the District Court properly confirmed the arbitration panel's decision in favor of Lloyd's. Century challenges the arbitration panel's decision, contending that the panel erred in refusing to hear extrinsic evidence that Century sought to submit regarding reinsurance industry custom and practice, the parties' course of dealing, and Lloyd's's own historical corporate practice of paying as well as seeking reimbursement for declaratory judgment expenses under reinsurance contracts covering expenses. Century claims that this exclusion deprived it of a fair hearing and

therefore requires the vacating of the award.

■ The FAA allows district courts to vacate arbitration awards "only under exceedingly narrow circumstances." *Dluhos v. Strasberg,* 321 F.3d 365, 370 (3d Cir. 2003) (citing 9 U.S.C. § 10).[29] One such circumstance is "where the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(3); *Dluhos,* 321 F.3d at 370. Section 10(a)(3) "cannot be read, however, to intend that every failure to receive relevant evidence constitutes misconduct which will require the vacation of an arbitrator's award." *Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co.,* 397 F.2d 594, 599 (3d Cir.1968). After all, even district courts sometimes reject evidence that they should admit and yet such erroneous rulings hardly can be characterized as "misconduct."

■ The cases make clear that vacatur pursuant to section 10(a)(3) is warranted only where "the arbitrator's refusal to hear proffered testimony 'so affects the rights of a party that it may be said that he was deprived of a fair hearing.'" *Teamsters Local 312 v. Matlack, Inc.,* 118 F.3d 985, 995 (3d Cir.1997) (quoting *Newark Stereotypers' Union No. 18,* 397 F.2d at 599). *See also Matteson v. Ryder Sys. Inc.,* 99 F.3d 108, 113 (3d Cir.1996); *Les-*

*sin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 481 F.3d 813, 818 (D.C.Cir. 2007) ("Every failure of an arbitrator to receive relevant evidence does not constitute misconduct requiring vacatur of an arbitrator's award[;] a federal court may vacate an award only if the panel's refusal to hear pertinent and material evidence prejudices the rights of the parties to the arbitration proceedings.") (internal citations and quotations omitted). Unsurprisingly, application of this "extremely deferential standard" generally results in the confirmation of an arbitration award, *Dluhos,* 321 F.3d at 370, though this is not to say that a court never can vacate an arbitrator's award by reason of his failure to consider relevant evidence. Nevertheless a court reviewing an arbitrator's decision to reject evidence might uphold an award even if an appellate court when reviewing a trial court's erroneous rejection of the evidence in similar circumstances might not find that the error was harmless.

■ Certainly it is clear that "in making evidentiary determinations, an arbitrator need not follow all the niceties observed by the federal courts." *Lessin,* 481 F.3d at 816 (citing *Tempo Shain Corp. v. Bertek, Inc.,* 120 F.3d 16, 20 (2d Cir. 1997)) (internal quotation marks omitted). Rather, an arbitrator "need only grant the parties a fundamentally fair hearing." *Id.* (internal quotation marks omitted). In fact, the reinsurance treaties incorporated

---

**29.** Section 10(a) of the FAA states:

In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the

hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

into the retrocessional agreements recognized as much as they directed the arbitrators to regard the treaties as "honorable engagement[s]" and, consistently with this characterization, relieved the arbitrators of "all judicial formalities" and any obligation to "follow[ ] the strict rules of law." Moreover, inasmuch as arbitrators "have wide latitude in how they conduct proceedings," *Office & Prof'l Employees Int'l Union, Local No. 471 v. Brownsville Gen. Hosp.*, 186 F.3d 326, 334 (3d Cir.1999), it is well within an arbitrator's authority to refuse to hear evidence that is of little relevance. *See Lessin*, 481 F.3d at 816; *Ass'n of Flight Attendants, AFL–CIO v. USAir, Inc.*, 960 F.2d 345, 350 (3d Cir.1992) ("[I]f the arbitrators are to receive evidence it must be up to them to decide issues of relevance [or] admissibility of evidence.").

Here, the arbitration panel refused to admit Century's proffered extrinsic evidence based on the panel's determination that the evidence was "irrelevant and inadmissible." App. at 175. The panel majority explained that there was no need to resort to extrinsic evidence to resolve ambiguities in the contracts because it had found the contracts in question to be clear and unambiguous. *Id.*

According to Century, the excluded evidence was pertinent and material under the follow-the-fortunes doctrine as well as to the determination whether the agreements were ambiguous, so its exclusion deprived Century of a fair hearing. First, Century contends that the excluded evidence was pertinent and material to the retrocessional agreements' follow-the-for-

tunes clauses. Reinsurance contracts often contain a follow-the-fortunes clause that "obligates the reinsurer to indemnify the reinsured for any good faith payment of an insured loss." *North River Ins. Co. v. CIGNA Reins. Co.*, 52 F.3d 1194, 1199 (3d Cir.1995). Such clauses operate to prevent reinsurers from second guessing the reinsured's good faith settlements with its insured and from obtaining de novo review of judgments of the reinsured's liability to its insured. *Id.* But follow-the-fortunes clauses typically do not make the reinsurer liable for risks beyond those it agreed to take in the reinsurance contract; a loss is not reinsured if the original insurance policy does not contemplate it or if the reinsurance agreement's terms expressly exclude it, and a reinsurer retains the right to question whether the reinsured's liability stems from such an unreinsured loss. *Id.* at 1199–1200.

■ Second, Century contends that the proffered evidence was pertinent and material to whether the retrocessional agreements were ambiguous and therefore required extrinsic evidence to ascertain the intent of the parties with respect to the questions the arbitrators addressed. *See Emerson Radio Corp.*, 253 F.3d at 164 (discussing determination of contract ambiguity).[30] Century argues that, at the very least, a determination as to ambiguity required consideration of the extrinsic evidence in addition to the parties' proffered views. *Id.* Century claims that the extrinsic evidence showed that the term "expenses," used in Paragraph 1 of the re-

30. As we have explained:

[W]hether a contract term is ambiguous is a question of law that requires a court to hear the proffer of the parties and determine if there [are] objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings. [B]efore we decide whether a contract is ambiguous, we must consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation.

*Emerson Radio Corp.*, 253 F.3d at 164 (internal citations and quotations omitted).

trocessional agreements, was at least ambiguous and that it was deprived of a fair hearing by the evidence's exclusion.

The panel concluded that the retrocession and reinsurance were unambiguous. Even so, the panel held a hearing at which it heard argument regarding the "proper construction of the contracts between the parties," App. at 173, and before which it received witness statements from Century "setting all the evidence which they would wish to lead in chief from" two witnesses it proposed, *id.* at 174, as well as written submissions from both parties regarding objections to that evidence.

The panel considered Century's witness statements containing the evidence that it would proffer in light of the follow-the-fortunes clause and concluded that the evidence was irrelevant or, at the very least, of very little probative value to the resolution of the issues of the dispute. Inasmuch as the question of whether the declaratory judgment expenses were within the terms of the original reinsurance treaties or the retrocessional agreements was to be based on constructions of those contracts, extrinsic evidence was irrelevant. *Id.* at 175–76. The arbitration panel further concluded that the witnesses' testimony regarding prior claims or payments by Lloyd's would be of little or no probative value without further inquiries into the precise circumstances of each claim or payment. *Id.* at 175–76. Based on its conclusion that the evidence was of little or no probative value and only would add unnecessary expense and delay to the proceedings, the panel excluded it. *Id.* Likewise, based on its conclusion that the construction of the reinsurance and retrocession was clear and unambiguous, the extrinsic evidence was irrelevant to construing the contracts more generally. App. at 173–75.

Considering the arbitrators' wide latitude in making evidentiary determinations, a latitude to which Century agreed in the arbitration clause in the reinsurance treaties and thus, by extension, agreed to in the retrocessional agreements when they incorporated the treaties by reference, we cannot find that there is a statutory basis to vacate the award. The arbitration panel did not commit "misconduct in refusing to hear evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(3). Rather, the panel considered the evidence and concluded, after receiving written submissions regarding its substance and relevance, that it was irrelevant, a finding that was within its authority to make. We emphasize that, pursuant to the terms of the arbitration agreement, the arbitrators were "relieved of all judicial formalities" and permitted to "abstain from the strict rules of law." App. at 59–60, 101, 127. Because the panel's evidentiary ruling based on written submissions and a hearing falls far short of arbitrator misconduct depriving Century of a fair hearing, we affirm the District Court's denial of Century's motion to vacate the arbitration award.

## V. CONCLUSION

We construe the retrocessional agreements between Century and Lloyd's to incorporate the arbitration agreement of the reinsurance treaties between Century and Argonaut, Century's reinsured, so that the arbitration agreement became effective between Century and Lloyd's, and we hold that the dispute here fell within that arbitration agreement's scope. Consequently, we conclude that the District Court properly compelled arbitration of the dispute arising from the retrocessional agreements over Lloyd's's failure to pay declaratory judgment expenses that Century had paid to its reinsured under the reinsurance treaties. Moreover, we hold that the arbi-

trators' decision to exclude evidence Century proffered based on the evidence's irrelevance was well within their authority in conducting the arbitration. We therefore conclude that the District Court properly denied Century's motion to vacate the arbitration award under 9 U.S.C. § 10(a)(3). For these reasons, we will affirm the orders of the District Court entered May 16, 2006, and May 30, 2008.